## In re THOMAS.

(Circuit Court, S. D. Ohio, W. D. June 30, 1897.)

### No. 5,042.

OLEOMARGARINE—USE IN NATIONAL SOLDIERS' HOME—POWER OF STATE TO REGULATE.

The governor of the soldiers' home at Dayton, Ohio, in serving to the inmates, as food, oleomargarine furnished by the government, is not subject to the law of the state prescribing the manner in which oleomargarine shall be used in eating houses, because his act is that of the government of the United States, within its constitutional powers, and wholly beyond the control or regulation of the legislature of the state.

D. W. Bowman and Harmon, Colston, Goldsmith & Hoadly, for petitioner.

D. L. Sleeper and C. H. Bosler, for the State of Ohio.

TAFT, Circuit Judge. In this case J. B. Thomas has filed a petition for a writ of habeas corpus. His petition states that he was on March 2, 1897, and has since continued to be, governor of the Central Branch of the National Military Home for Disabled Volunteer Soldiers, which is located in Montgomery county, Ohio, on certain grounds purchased, held, and used by the United States for the pur-

poses set forth in an act entitled "An act incorporating a national military and naval asylum for the relief of the totally disabled officers and men of the volunteer forces of the United States," approved March 3, 1865, and the act amendatory thereof, approved March 21, 1866, and other acts amendatory and supplementary thereto; that he is unjustly and unlawfully detained and deprived of his liberty at the city of Dayton, in the county aforesaid, by one L. J. Shafer, a constable of said county, by virtue of a certain warrant of commitment issued by one J. R. Thompson, a justice of the peace within and for said county, charging that the petitioner, as governor as aforesaid, did, on March 2, 1897, unlawfully serve and furnish to the inmates of said National Military Home for Disabled Volunteer Soldiers, as food to be then and there eaten by said inmates, certain oleomargarine, in violation of the statutes of the state of Ohio; that petitioner, being brought before said justice of the peace, refused to plead to said charge, and moved to dismiss the same on the ground that the acts upon which said proceeding was founded were done by him in the discharge of his duty as governor of said national home under the authority of the board of managers in charge of said institution by virtue of the acts of congress aforesaid, and by authority of said acts; that they were entirely done and performed on the grounds acquired, used, and controlled by the United States for the purpose of said home, and with respect to the inmates thereof, only in their maintenance and support by the United States, and not otherwise, said acts having consisted merely in distributing to them supplies procured for such use by authority of congress and said board of managers; that the facts averred above as the ground of said motion are true; that, notwithstanding the premises, said justice of the peace proceeded to try petitioner on said charge, found and adjudged him guilty of the offense aforesaid, and sentenced him to pay a fine of $50, and stand committed until the same should be paid, and thereupon issued the warrant of commitment aforesaid. Petitioner avers that said justice of the peace had no jurisdiction over the lands and territory whereon said acts were done, or over the petitioner, by reason of said acts, and that said proceedings and warrant of commitment are wholly void. A writ of habeas corpus issued upon this petition. The body of the petitioner was produced into court. The constable made a return that he held the said J. B. Thomas under the commitment of a magistrate as averred in the petition. On the hearing in this court it appeared that there was an agreed statement of facts in the cause before the justice of the peace as follows:

"The following facts are agreed upon to support the issues in the above-entitled cause: It is agreed on behalf of the state of Ohio, Charles H. Bosler, its attorney in this action, being present, and consenting thereto, and the defendant, J. B. Thomas, being present, and, with counsel, also agreeing thereto: (1) That on the 2d day of March, 1897, Joseph E. Blackburn was, and now is, the food and dairy commissioner of the state of Ohio. (2) That on the 2d day of March, 1897, J. B. Thomas was, and now is, the duly chosen and acting governor of the Central Branch of the National Home for Disabled Volunteer Soldiers, located in the county of Montgomery, state of Ohio, and as said governor was in charge of the eating house of the said Central Branch of the National Home for Disabled Volunteer Soldiers. (3) Said eating house is used by said J. B. Thomas for serving and furnishing to the inmates of said Central

Branch of the National Home for Disabled Volunteer Soldiers their daily food or rations, and is the only place so provided at said national home, and is known as the mess room of the said Central Branch of the National Home for Disabled Volunteer Soldiers, situate on the grounds purchased, held, and used by the United States therefor; and the acts complained of herein consisted in causing oleomargarine to be served and furnished, on the 2d day of March, 1897, as food and as part of the rations furnished to the inmates thereof under appropriation made by the congress of the United States for the support of said inmates; and that no placard in size not less than 10x14 inches, having printed thereon in black letters not less in size than 1½ inches square the words 'Oleomargarine Sold and Used Here,' was displayed in said eating house. (4) The affidavit in the cause is made in conformity with an act of the general assembly of the state of Ohio (Ohio Laws, vol. 92, page 23) entitled 'An act to amend section 3 of an act entitled "An act to prevent fraud and deception in the manufacture and sale of oleomargarine and promote public health in the state of Ohio," passed May 16, 1894': 'Section 1. Be it enacted by the general assembly of the state of Ohio, that section 3 of an act entitled "An act to prevent fraud and deception in the manufacture and sale of oleomargarine and promote public health in the state of Ohio," be amended to read as follows: "Section 3. Every proprietor, keeper, manager or person in charge of any hotel, boat, railroad car, boarding-house, restaurant, eating-house, lunch-counter or lunch-room, who therein sells, uses, serves, furnishes or disposes of or uses in cooking, any oleomargarine, shall display and keep a white placard in a conspicuous place, where the same may be easily seen and read, in the dining-room, eating-room, restaurant, lunch-room or place where such substance is furnished, served, sold or disposed of, which placard shall be in size not less than ten by fourteen inches, upon which shall be printed in black letters, not less in size than one and a half inches square. the words 'Oleomargarine Sold and Used Here,' and said card shall not contain any other words than the ones above described, and such proprietor, keeper, manager or person in charge shall not sell, serve or dispose of such substance as for butter when butter is asked for or purported to be furnished or served." Sec. 2. Section 3 of the above recited act, passed May 16. 1894, is hereby repealed, and this act shall take effect and be in force from and after its passage.' "

By the act of March 3, 1865 (13 Stat. 509), the act of March 21, 1866 (14 Stat. 10), the act of January 23, 1873 (17 Stat. 417), the act of March 3, 1875 (18 Stat. 359), and the act of February 26, 1875 (18 Stat. 524), a national home for disabled volunteer soldiers was established, and the legislation above indicated has been embodied in sections 4825 to 4837, inclusive, of the Revised Statutes of the United States. These sections are now under chapter 3 of title 59 of "Hospitals and Asylums." Section 4825 establishes a board of managers of such home, who are to have perpetual succession, with the power of holding personal and real property, and of suing and being sued. They are also given the power to make rules and by-laws not inconsistent with the law, for the purpose of carrying on the business and government of the home, and to fix penalties thereto. Section 4829 provides that the officers of the home shall consist of a governor, a deputy governor, a secretary, and a treasurer, and such other officers as the managers may deem necessary. Section 4830 provides that the board of managers shall have authority to procure from time to time, at suitable places, sites for military homes for all persons serving in the army of the United States at any time in the War of the Rebellion, not otherwise provided for, who have been or may be disqualified for procuring their own support by reason of wounds received or sickness contracted while in the line of their duty during the Rebellion; and to have the necessary buildings erected,

having due regard to the health of location, facility of access, and capacity to accommodate the persons entitled to the benefits thereof. Section 4831 appropriates all stoppages or fines adjudged against officers and soldiers by sentence of court-martial, or forfeitures on account of desertion, and all moneys due deceased officers and soldiers unclaimed for three years after their death, to the establishment and support of the home. The managers are also authorized to receive donations, money, or property for the benefit of the home, and to hold the same for its exclusive use. Section 4832 provides 'who of the officers and soldiers of the government of the United States shall be entitled to the benefit of the national home. Section 4834 provides that the board of managers shall make an annual report of the condition of the home to congress. Section 4835 provides that "all inmates of the National Home for Disabled Volunteer Soldiers shall be subject to the rules and articles of war and in the same manner as if they were in the army." Under the laws of 1865–66 the first board of managers purchased real estate in Montgomery county, near Dayton. Ohio, and there erected buildings to constitute a national home. Since that time branches have been established in Augusta, Me.. Milwaukee, Wis., and Hampton, Va. On April 13, 1867, the legislature of Ohio passed the following act:

"Section 1. That jurisdiction of the lands and their appurtenances, which may be acquired by donation or purchased by the managers of the National Asylum for Disabled Volunteer Soldiers within the state of Ohio, for the uses and purposes of said asylum, be, and is hereby ceded to the United States of America; provided, however, that all civil and criminal process issued under the authority, of the state of Ohio, or any officer thereof, may be executed on said lands and in the buildings which may be located thereon, in the same way and manner as if jurisdiction had not been ceded as aforesaid; and provided further, that nothing in this act shall be construed to prevent the officers, employés and inmates of said asylum, who are qualified voters of this state, from exercising the right of suffrage to all township, county, and state elections, in the township in which the said national asylum shall be located."

The second section of the same act exempts all the property, real and personal, held by the board of managers for the uses and purposes of the asylum, from taxation and assessment, "so long as the same shall remain the property of the United States, for the uses of the national asylum."

In Sinks v. Reese, 19 Ohio St. 306, the question arose whether an inmate of the national home at Dayton had the right of suffrage as a citizen of the state of Ohio, and the supreme court of Ohio held:

"The inmates of the home, resident within such territory, being within the exclusive jurisdiction of a government other than that of the state within whose boundaries such asylum or territory may be situate, are not residents of such state, within the meaning of article 5, § 1, of the constitution of Ohio; and where the constitution of such state confers the elective franchise upon residents thereof alone, the inmates of such asylum resident within such territory are not entitled to vote at any election held within and under the laws of such state."

Thereupon congress, by the act of January 21, 1871 (16 Stat. 399), enacted:

"That the jurisdiction over the place purchased for the location of the 'National Asylum for Disabled Volunteer Soldiers' under and by virtue of the act

of congress of March third, 1865, entitled 'An act to incorporate a national military and naval asylum for the relief of the totally disabled officers and men of the volunteer forces of the United States' and the act of March 21st, 1866, amendatory thereto and upon which said asylum is located, is hereby ceded to the state of Ohio and relinquished by the United States. And the United States shall claim or exercise no jurisdiction over said place after the passage of this act: provided, that nothing contained in this act shall be construed to impair the powers·and rights heretofore conferred upon the board of managers of the National Asylum for Disabled Volunteer Soldiers incorporated under said act, in and over said territory."

In Renner v. Bennett, 21 Ohio St. 431, the supreme court of Ohio, in construing the act of congress of January 21, 1871, held that its effect was to restore to the state its jurisdiction over the territory, but without the power to violate the charter rights of the corporation, or rather of the United States, claiming and enjoying them through and by the corporation; thus putting the state in the same relation to this corporation that it sustained towards such of its own corporations as had an irrevocable and inviolable charter, and therefore that the territory upon which the home stood was within the jurisdiction of the state, and the inmates of the home were residents of the state, and were legal voters therein.

It is unnecessary, in my view, to consider the question what is the territorial jurisdiction of the state of Ohio over the land occupied by the national home at Dayton. Let it be conceded that the case presented upon the petition and the facts shown at the hearing is not different from what it would have been had the legislature of Ohio never passed any act ceding jurisdiction to the United States over the land acquired for the purpose of a national military home. In such a case, can it be maintained that the legislature of the state of Ohio may pass an act which shall regulate in any way the manner in which federal governmental functions shall be discharged by the board of managers of the national home as agents of the national government? It is very clear to me that the question must be answered in the negative. Nor can there be any doubt that the acts of the petitioner complained of, and made the ground for prosecution under the state law, were acts in pursuance of the authority of the national government reposed in it by the constitution of the United States. By that instrument congress is given power by taxation to provide for the common defense and general welfare of the United States. It is given power to declare war, to raise and support armies, to provide and maintain a navy, to make rules for the government and regulation of the land and naval forces, to provide for calling forth the militia, to suppress insurrections and repel invasions, to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, and to make all laws which shall be necessary and proper for carrying into execution these powers. In the case of U. S. v. Gettysburg Electric Ry. Co., 160 U. S. 668, 16 Sup. Ct. 427, it was he'd that the act providing for the condemnation of land for the purpose of fencing in and preserving the lines of battle at the battle of Gettysburg, and of making a national park of the same, was within the

power of congress. It was objected that the purpose of the act could not be for "the public use," within the powers of the general government. Upon this subject Mr. Justice Peckham, speaking for the supreme court, said:

"Congress had power to declare war, and to create and equip armies and navies. It has the great power of taxation to be exercised for the common defense and general welfare. Having such powers, it has such other and implied ones as are necessary and appropriate for the purpose of carrying the powers expressly given into effect. Any act of congress which plainly and directly tends to enhance the respect and love of the citizen for the institutions of this country, and to quicken and strengthen his motives to defend them, and which is germane to and intimately connected with and appropriate to the exercise of some one or all of the powers granted by congress, must be valid. * * * Can it be that the government is without power to preserve the land, and properly mark out the various sites upon which this struggle took place? Can it not erect the monuments provided for by these acts of congress, or even take possession of the field of battle in the name and for the benefit of all the citizens of the country for the present and for the future? Such a use seems, necessarily, not only a public use, but one so closely connected with the welfare of the republic itself as to be within the powers granted congress by the constitution for the purpose of protecting and preserving the whole country. It would be a great object lesson to all who looked upon the land thus cared for, and it would show a proper recognition of the great things that were done there on those momentous days. By this use the government manifests for the benefit of all its citizens the value put upon the services and exertions of the citizen soldiers of that period. Their successful effort to preserve the integrity and solidarity of the great republic of modern times is forcibly impressed upon every one who looks over the field. The value of the sacrifices then freely made is rendered plainer and more durable by the fact that the government of the United States, through its representatives in congress assembled, appreciates and endeavors to perpetuate it by this most suitable recognition. * * * The right to take land for cemeteries for the burial of the deceased soldiers of the country rests on the same footing, and is connected with and springs from the same powers of the constitution. It seems very clear that the government has the right to bury its own soldiers, and to see to it that their graves shall not remain unknown or unhonored."

The same power that exists to create national parks and to create national cemeteries is exercised in the erection and maintenance of a national home to care for the defenders of the nation, who, though not killed, were disabled and wounded in the defense. The housing and feeding of such persons are, then, a federal governmental function and duty. When the government of the United States purchases land in a state for the purpose of discharging such a duty, it is not within the power of the state legislature to interfere with or regulate the mode in which it shall be performed. What it does for this purpose is exactly as much within its complete control as when its quartermaster furnishes food to its soldiers, or when its pension agents distribute money to its pensioners. It is entirely immaterial in what place, within the jurisdiction of the government of the United States, the duty is discharged. State lines cannot affect or modify the complete control which the federal government and its agents and officers duly authorized have over the manner of discharging it. The jurisdiction of the state government in such a case is excluded not because of the place where the act is done, but because that which is being done is the business of the United States, and such business is as completely be-

yond the influence and control of the state government as if it were not done within the territory of the state. It is in evidence that in the report made by the board of managers to congress, provided by law, an appropriation was asked for oleomargarine, and that the appropriation was made by congress to cover the proposed expenditure. Would it be contended that, if congress were to pass an act providing that oleomargarine should be served by its quartermaster in the messes of its troops, and a state were to pass a law forbidding the use of it as an unhealthful food, such a law could affect officers obeying the laws of congress in thus furnishing oleomargarine within the state's lines to the military forces of the United States, and would subject them to punishment before a state tribunal for violation of the state law? Clearly not. It seems hardly necessary to me to give illustration, to be found in many decisions of the supreme court of the United States, of cases in which it has been held that no state can pass a law which shall in any manner interfere with or prevent the due exercise of its constitutional functions by the United States government through its officers and agents.

In Ex parte Siebold, 100 U. S. 371, 394, Mr. Justice Bradley said:

"It is argued that the preservation of peace and good order in society is not within the powers confided to the government of the United States, but belongs exclusively to the states. Here, again, we are met with the theory that the government of the United States does not rest upon the soil and territory of the country. We think that this theory is founded on an entire misconception of the nature and powers of that government. We hold it to be an incontrovertible principle that the government of the United States may, by means of physical force exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent. This power to enforce its laws and to execute its functions in all places does not derogate from the power of the state to execute its laws at the same time, and in the same place. The one does not exclude the other, except where both cannot be executed at the same time. In that case the words of the constitution itself show which is to yield: 'This constitution, and all laws which shall be made in pursuance thereof, * * * shall be the supreme law of the land.' "

Again, in the case of Tennessee v. Davis, 100 U. S. 257, 262, Mr. Justice Strong, quoting from Martin v. Hunter, 1 Wheat. 363, said: "The general government must cease to exist whenever it loses the power of protecting itself in the exercise of its constitutional powers," and then proceeded:

"It can act only through its officers and agents, and they must act with the states. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a state court for an alleged offense against the law of the state, yet warranted by the federal authority they possess, and if the general government is powerless to interfere at once for their protection, if their protection must be left to the action of the state court, the operations of the general government may at any time be arrested at the will of one of its members. The legislation of a state may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws. The state court may administer not only the laws of the state, but equally federal laws, in such manner as to paralyze the operations of the government. And even if, after trial and final judgment in the state court, the case can be brought into the United States court for review, the officer is withdrawn from the discharge of his duty during the pendency of the prosecu-

tion, and the exercise of acknowledged federal power arrested. We do not think such an element of weakness is to be found in the constitution. The United States is a government with authority extending over the whole territory of the Union, acting upon the states and upon the people of the states. While it is limited in the number of its powers, so far as its sovereignty extends it is supreme. No state government can exclude it from the exercise of any authority conferred upon it by the constitution, obstruct its authorized officers against its will, or withhold from it for a moment the cognizance of any subject which that instrument has committed to it."

The same principle was upheld by Mr. Justice Miller in the case of In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658.

In my judgment, the governor of the soldiers' home was not subject to the law prescribing the manner in which oleomargarine should be served in eating houses, not because the place in which he was serving the oleomargarine was without the territorial jurisdiction of the state of Ohio, but because that which he was doing was an act of the government of the United States within its constitutional powers, and wholly beyond the control and regulation of the legislature of the state of Ohio. The petitioner is discharged.