## PUNDT v. PENDLETON, Jailer.

(District Court, N. D. Georgia, N. W. D.   February 11, 1909.)

1. UNITED STATES (§ 3*)—AUTHORITY OVER PROPERTY ACQUIRED WITHIN STATES —MILITARY POST.

The land on which Ft. Oglethorpe is located in Georgia, being a part of that acquired by the United States for a National Military Park with the consent of the State Legislature, which ceded jurisdiction of the lands and roads therein, said fort being used as a military post, is within the provision of the Constitution of the United States, art. 1, § 8, giving exclusive jurisdiction over forts, etc., to Congress, and neither the state nor other local authorities have power to interfere with any instrumentalities necessary to the proper use of such location as a military post.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 3; Dec. Dig. § 3.*]

2. ARMY AND NAVY (§ 27*)—TEAMSTERS IN QUARTERMASTER'S DEPARTMENT—LIABILITY TO WORK ROADS UNDER STATE LAW.

A teamster in the permanent employment of the Quartermaster's Department of the United States army, stationed at the military post of Ft. Oglethorpe in Georgia, and under articles 1 and 730 of the army regulations required to obey strictly and execute promptly the orders of his superiors, cannot be required by the local officers of the state to appear and work on the roads outside of the fort and reservation, and his detention in jail for a failure to perform such road work is a violation of his rights under the Constitution and laws of the United States.

[Ed. Note.—For other cases, see Army and Navy, Dec. Dig. § 27.*]

3. JUDGMENT (§ 828*)—CONCLUSIVENESS OF ADJUDICATION—DISMISSAL.

A judgment of a state court dismissing a writ of certiorari to review a sentence of imprisonment for want of notice, and not on the merits, is not a bar to a subsequent proceeding by the petitioners for release on a writ of habeas corpus.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1504–1509; Dec. Dig. § 828.*]

4. HABEAS CORPUS (§ 45*)—FEDERAL COURTS—STATE PRISONERS—DISCRETION TO DISCHARGE.

A federal court will discharge from imprisonment by a state, on a writ of habeas corpus, a teamster in the employment of the Quartermaster's Department of the army, where such imprisonment is in violation of the Constitution and laws of the United States and prevents the performance of the duties of his employment.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 38–45; Dec. Dig. § 45;* Courts, Cent. Dig. §§ 1376–1385.*]

Habeas Corpus.

John W. Henley, for complainant.

William E. Mann, for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

NEWMAN, District Judge. The matter for determination here arises on a petition for writ of habeas corpus issued on behalf of the petitioner, W. A. Pundt, the answer of the jailer of Catoosa county, to whom the writ was directed, and agreed statement of facts, together with certain documentary evidence. The statement of facts, which will show clearly the question raised, is as follows:

"Agreement.

"It is agreed by and between John W. Henley, Assistant United States Attorney, representing the petitioners, and William E. Mann, attorney at law, representing the respondent in the above-stated case, that the following evidence and facts be submitted to the court for determination of said cases, and that the same constitute the material evidence in said cases, as follows:

"(1) That each of said petitioners has continuously resided at Ft. Oglethorpe, on the premises known as 'Fort Oglethorpe Military Post,' as follows: James Price more than twelve months; James L. Kennedy about three years; G. K. Peavey about three years; D. A. Mowery since 1906; W. A. Pundt three years. During all this time each of them has been employed as teamster in the Quartermaster's Department of the United States military service at Ft. Oglethorpe, and has been domiciled in a building of the government at said fort, which building is a part of the fort. That on or about the 2d day of December, 1907, each of said petitioners was warned by the road overseer to meet him at Cloud Springs Church on the 4th day of December, 1907, to work the public road; that said road is situated outside of said military post, and outside of the Chickamauga and Chattanooga National Park, within the road district wherein said road commissioners resided. That said teamsters, under the rules and regulations of the Quartermaster's Department and the Army Regulations, are required to obey strictly and execute promptly the orders of their superiors as required by Army Regulations 1 and 730; that they are subject to the order of the Quartermaster's Department at said post, and their duties are necessary and important in said department. That on account of their duties to the government they did not obey said summons and did not work the public roads. That on account of said default the road commissioners of Catoosa county caused to be served on D. A. Mowery, W. A. Pundt, George L. Kennedy, and G. K. Peavey notice to appear before said road commissioners on the 28th day of December, 1907, to answer said default. That no notice was served on James Price, except by posting notice as required by section 546, Code Ga. 1895, which notice was posted in compliance with said section. That the said James Price did not appear for trial under said notice, either in person or by attorney, and was not present when the road commissioners adjudged him to be in default and made an order committing him to Catoosa county jail for thirty days in default of the payment of the sum of $12 adjudged by them against him. The other petitioners in this case did appear before said commissioners on the 28th day of December, 1907, and testified in their own behalf. That said road commissioners on the 28th day of December, 1907, passed an order and judgment in each of said cases requiring each of them to pay a fine of $12 and all costs of the proceeding, to be collected by execution, or in default that each of them be committed to the common jail of said county for the term of thirty days. That on the same day the said road commissioners passed an order in each of said cases to the effect that, each of said petitioners refusing to pay the above-adjudged penalty or judgment, it is the order of the road commissioners' court of the 1096th district that he (each of the petitioners in this case) be committed to the common jail of said Catoosa county for the term of thirty days, there to be received and safely kept by the jailer for said term; that on the same day the said road commissioners passed a further order with reference to each of these petitioners, to the effect that, he having appeared before us as a road defaulter, after hearing the evidence, it is ordered that he be committed to the common jail of said county for a term of thirty days, and be safely kept by the jailer for said term; that on the same day the following order was passed with reference to each of said petitioners, to the effect that he

(each of the said petitioners) has been committed to the common jail of said county as a road defaulter by us for a term of thirty days, may be discharged from prison by paying the penalty adjudged by us for four days at $12, also the further sum of $1.75, costs of this suit.

"(2) It is further agreed that petitioners in this case applied for and obtained the sanction of the writ of certiorari, which came on for hearing before Judge Fite at Dalton on 12th day of October, 1908, and that, after argument on the motion to dismiss, the court ordered and adjudged that the certiorari in each of said cases be dismissed upon the ground that no notice had been served upon the opposite party in interest as required by law, and that the judgment of the court below be affirmed, and that each of said petitioners in certiorari and his surety on his bond pay the costs of said proceeding. And further ordered that the execution of the remainder of the sentence of imprisonment imposed by the road commissioners be suspended until the 22d day of October, 1908, and that each of said plaintiffs in certiorari then appear and abide and perform said sentence of imprisonment. That the certiorari in said cases was not heard upon its merits. That each of the petitioners in this case appeared at Ringgold on the 22d day of October, 1908, and entered upon the execution of the sentence of imprisonment rendered by the road commissioners imposing the sentence of imprisonment for a term of thirty days in Catoosa county jail. That they and each of them were so imprisoned and were in the custody of James B. Pendleton, jailer of Catoosa county, at the time their petition for writ of habeas corpus was made in this case, and at the time the writ of habeas corpus was served.

"(3) It is further agreed that the lands on which Ft. Oglethorpe is situated, where petitioners resided at the time they were required to work the road, was acquired by the United States by purchase with the consent of the Legislature of the state of Georgia as expressed in an act of the General Assembly of Georgia as set forth in Georgia Laws 1890-91, vol. 1, p. 200.

"(4) It is further agreed that all the roads on Ft. Oglethorpe Military Reservation, and all the roads on Chickamauga and Chattanooga National Park, and the road from Ringgold to said park, as well as the road from Lafayette to the Tennessee state line, aggregating about one hundred miles, are maintained, worked, and kept up by the United States government. That the roads on Ft. Oglethorpe Military Reservation are worked and kept up by the Quartermaster's Department at said reservation.

"(5) It is further agreed that George L. Kennedy claims to be a resident of the state of Alabama; D. A. Mowery claims his residence in the state of Kentucky; G. K. Peavey claims his residence in Dooley county, Ga.; W. A. Pundt claims to reside in the state of Texas.

"(5a) It is further agreed that the certiorari proceedings in the cases of each of these petitioners against L. R. Williams, C. S. Benton, and A. D. Beaver, district road commissioners of Catoosa county, so far as may be necessary on the investigation of this case, be submitted as a part of the evidence.

"(6) It is further agreed that Ft. Oglethorpe was designated and established in compliance with the laws of the United States.

"(7) That petitioners can resign and quit their employment by the government at their option, except as bound by contract.

"This 5th day of November 1908.

"[Signed] John W. Henley, Asst. U. S. Atty., for Petitioners.
"W. E. Mann, Atty. as of Record."

The statute of the state of Georgia on the subject of road duty provides:

"All male inhabitants of this state between the ages of sixteen and fifty shall be subject to work on the public road."

To this general duty there are certain exceptions not material here.

The petitioner was employed as a teamster in the Quartermaster's Department in the United States army in connection with

the troops of the regular army of the United States stationed at Ft. Oglethorpe. The land on which Ft. Oglethorpe and the buildings appurtenant to it are situated is a part of a tract of land of which jurisdiction was ceded to the United States by an act of the Legislature of Georgia (Laws Ga. 1890–91, vol. 1, p. 200), as follows:

"Be it enacted by the General Assembly of the state of Georgia, that the jurisdiction of this state is hereby ceded to the United States of America over all such lands and roads as are described and referred to in the foregoing preamble to this act, which lie within the territorial limits of this state, for the purpose of a National Park, or so much thereof as the national Congress may deem best; provided, that this cession is upon the express condition that the state of Georgia shall so far retain a concurrent jurisdiction with the United States over said lands and roads as that all civil and criminal process issued under the authority of this state may be executed thereon in like manner, as if this act had not been passed; and upon the further express conditions, that the state shall retain its civil and criminal jurisdiction over persons and citizens in said ceded territory as over other persons and citizens in the state, and the property of said citizens and residents thereon, except land and such other property as the general government may desire for its use, and that the property belonging to persons residing within said ceded territory shall be liable to state and county taxes, the same as if they resided elsewhere, and that citizens of this state in said ceded territory shall retain all rights of state suffrage and citizenship; provided further, that nothing herein contained shall interfere with the jurisdiction of the United States over any matter or subjects set out in the act of Congress establishing said National Park, approved August 19, 1890, or with any laws, rules or regulations that Congress may hereafter adopt for the preservation or protection of its property and rights in said ceded territory, and the proper maintenance and good order therein; provided further, that this cession shall not take effect until the United States shall have acquired title to said lands."

This act followed Act Cong. Aug. 19, 1890, c. 806, 26 Stat. 333, an act by the language of the preamble to establish a National Military Park at the battlefield of Chickamauga.

It appears that the particular part of the tract of land on which Ft. Oglethorpe is located, although within the boundaries set out in the preamble of the act of the Legislature just referred to, was for some reason not acquired at the time that a large portion of the land for the park was obtained by purchase and by condemnation proceedings, but was acquired subsequently, by order of the Secretary of War, and through the War Department; and upon this part of the land, apparently, the military reservation known as "Ft. Oglethorpe" was designated by the War Department by two orders issued May 6, 1906, and November 3, 1906, respectively. This land comprising the Ft. Oglethorpe reservation is partly in Catoosa county, and some of this was presumably before the cession a part of the 1906 militia district, the district in which controversy arose, and in which the road commissioners acted.

Jurisdiction is ceded within the park not only of the lands but of the roads, and these roads are kept up by the United States. The roads which the petitioner was summoned to work are outside of the park and the military reservation. The Constitution of the United States, art. 1, § 8, provides:

"The Congress shall have power * * * to exercise exclusive jurisdiction in all cases whatsoever * * * over all places purchased by the consent

of the Legislature of the state in which the same shall be for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."

This clause of the Constitution is fully discussed in the case of Ft. Leavenworth Railroad Company v. Lowe, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264, in the opinion by Mr. Justice Field. It would seem from what is there stated, and the authorities cited, including the opinions of Attorneys General, that, where land is acquired by the consent of the Legislature of the state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings," the jurisdiction of the United States over the ceded territory would be exclusive, but where acquired in any other way the rule applicable would be this:

"Where, therefore, lands are acquired in any other way by the United States, within the limits of a state than by purchase with her consent, they will hold the lands subject to this qualification: That if upon them forts, arsenals, or other public buildings are erected for the use of the general government, such buildings, with their appurtenances as instrumentalities for the execution of its powers, will be free from any such interference and jurisdiction of the state as would destroy or impair their effective use for the purposes designed. Such is the law with reference to all instrumentalities created by the general government. Their exemption from state control is essential to the independence and sovereign authority of the United States within the sphere of their delegated powers.

"But when not used as such instrumentalities, the legislative power of the state over the places acquired will be as full and complete as over any other places within her limits."

As heretofore stated, the land on which Ft. Oglethorpe is located is within the limits of the tracts of land acquired by the United States by the consent of the Legislature of the state. The purpose for which these lands were acquired, as named in the cession, was for a "National Park." The purpose named in the act of Congress was a "National Military Park." The act of Congress was in the mind of the Legislature of the state, as shown by the reference to it in the caption of the act. So it seems that little question could exist that to use this land for a military post is in line with the purpose of the cession, even testing it by the language used in the act of the Legislature, and more so when considered in connection with the act of Congress. It is certainly not in any way antagonistic to the purpose contemplated. It is perfectly clear that, the government having decided it was necessary and proper to establish a military post there, and having established such post by order of the War Department, neither the state, nor any county of the state, would have the right to interfere with any instrumentalities necessary to the proper use of this location as a military post, and to render that use effective and complete.

This would be true even if the lands had been acquired within the state, without any consent whatever on the part of the Legislature of the state. Taking into consideration, however, the act of the Legislature, passed in view of and to effectuate the act of Congress, I do not think there is any material difference, for present purposes at least, between the situation here and what it would be if the act of

the Legislature had been in the language of the constitutional provision as to the establishment of forts, arsenals, etc.

The original intention in establishing the Chickamauga and Chattanooga National Park was that it should embrace the battlefield of Chickamauga, or so much of it as could reasonably be obtained, and the purpose of establishing the park was that it should commemorate one of the great conflicts of the Civil War, the Battle of Chickamauga. It is made the duty of the Secretary of War, through commissioners to be appointed, to repair the roads within the park, and to make such new roads as may be necessary; also to provide approaches to the park; to erect monuments as Congress might make the necessary appropriation; to ascertain and mark lines of battle; to erect tablets, etc. The use, therefore, of a part of the ceded land for a military post, while not coming strictly within the act of cession, is at least not antagonistic thereto. After the establishment of the park, a certain number of troops there would be proper, and might be necessary, to protect the property and to carry out the purpose of the cession. It is certainly true that the county of Catoosa would have no right to interfere in any way with the troops located at Ft. Oglethorpe, or with anything necessary and proper to be used in connection with the fort as a military post, and the troops located there.

It is not claimed, and will not be claimed, of course, that the officers and enlisted men of the army stationed at the fort are subject to road duty in Catoosa county. Are teamsters employed and regularly used by the Quartermaster's Department at the fort subject to such road duty?

Section 1133, Rev. St. U. S. (U. S. Comp. St. 1901, p. 823), provides:

"It shall be the duty of the officers of the Quartermaster's Department, under the direction of the Secretary of War to purchase and distribute to the army all military stores and supplies, requisite for its use, which other corps are not directed by law to provide; to furnish means of transportation for the army, its military stores and supplies, and to provide for and pay all incidental expenses of the military service which other corps are not directed to provide for and pay."

Army Regulation 1009 is as follows:

"The Quartermaster's Department is charged with the duty of providing means of transportation of every character either under contract or in kind, which may be needed in the movement of troops and material of war. It furnishes all public animals employed in the service of the army, the forage consumed by them, wagons and all articles necessary for their use, and the horse equipments for the Quartermaster's Department. It furnishes clothing, camp and garrison equipment, barracks, store houses, and other buildings; constructs and repairs roads, railways, bridges, builds and charters ships, boats, docks and wharves needed for military purposes, and attends to all matters connected with military operations which are not expressly assigned to some other bureau of the War Department."

By Act Cong. March 1, 1875, c. 115, 18 Stat. 337 (U. S. Comp. St. 1901, p. 973), the President is authorized to make and publish regulations for the government of the army, in accordance with existing laws.

By section 2 of Act June 23, 1879, c. 35, 21 Stat. 34 (U. S. Comp. St. 1901, p. 973), the Secretary of War is authorized and directed

to cause all the regulations of the army and general orders now in force to be codified and published. Pursuant to these acts of Congress, army regulations have been made and published. Among such regulations are the following:

Army Regulation 1:

"All persons in the military service are required to obey strictly and to execute promptly the lawful orders of their superiors."

Army Regulation 730 is as follows:

"In the Staff Corps and departments the employment of civilians will be regulated by the respective chiefs of bureaus under the direction of the Secretary of War. Those whose services are engaged with the intention or probability of retaining them for more than three months are classified as permanent employés. Their appointment, dismissal, promotion or reduction will be made under the supervision of the respective chiefs of bureaus, by the officers employing them, except as controlled by statute or the civil-service rules; but in selections for such employment preferences will be given, as far as practicable, to applicants who have served meritoriously as enlisted men in the army, and the appointments, and promotions of all permanent employés, except mechanics, laborers, teamsters, and others of similar or kindred occupations, will be submitted for the approval or confirmation of the Secretary of War."

Section 1342, Rev. St. (Article of War 63 [U. S. Comp. St. p. 957]), provides:

"All retainers to the camp, and all persons serving with the armies of the United States in the field, though not enlisted soldiers, are subject to orders, according to the rules and discipline of war."

The petitioner W. A. Pundt is a teamster in the permanent employment of the Quartermaster's Department of the army. It is unnecessary almost to discuss the necessity of teamsters to the military service. A military post could not be properly maintained, if indeed it could be maintained at all, without teamsters. The character of an army teamster's service and his duties are such that it would be impossible for him to perform them properly and be at the call of the road commissioners to work the public roads of Catoosa county outside of the government's property.

Pundt is not an "inhabitant" of the state in the sense in which that term is used in the statutes of Georgia in reference to road duty. He comes from another state, and is in this state and in Catoosa county simply as an employé of the Quartermaster's Department of the army. In the language of the Circuit Court of Appeals for the Sixth Circuit (In re Thomas, 87 Fed. 453, 31 C. C. A. 80):

"Inasmuch as the Legislature * * * had no power to regulate the conduct of this administrative agency of the national government by such a statute as is here in question, it ought to be presumed that the Legislature did not intend it to have such an application, and that the statute should be construed accordingly."

This view of the matter, however, is not controlling with me, because I believe Pundt is exempt from this road duty not only for the reason just mentioned, but because of the fact that he is a necessary instrumentality in that portion of the United States army stationed at Ft. Oglethorpe, and that he is such an important and necessary part

of the military establishment as that the state and the county of
Catoosa has no right to call on him to be absent from the fort when
such absence would interfere with the proper discharge of his duties
as a necessary and important, even if an humble, part of the army
of the United States.

The roads within the park, including the Ft. Oglethorpe property,
comprise roads of about 100 miles open to the public, and these roads
are kept up and maintained by the United States, so that it is not only
illegal, and in my judgment in contravention of the laws of the Unit-
ed States, but it is unfair, that any persons actively and regularly
connected with the army post should be called upon to perform road
duty on the roads of Catoosa county outside of the park.

The necessary conclusion, therefore, is that, on account of the pe-
titioner's position and duties in connection with the Quartermaster's
Department of the army at Ft. Oglethorpe, he is not subject to road
duty in Catoosa county as claimed by the road commissioners, and that
his detention in jail for failure to perform such road duty is in viola-
tion of his rights under the Constitution and laws of the United States,
such laws including the Articles of War and the Army Regulations,
the latter made in pursuance of the statutes of the United States,
and therefore, for present purposes, considered as a part of the
statutes.

2. As will be seen, from the agreement of facts in this case, a writ
of certiorari was applied for from the decision of the road commis-
sioners, and the same was dismissed in the superior court on the
ground, as expressed in the order of dismissal, "that no notice has
been served on the opposite party in interest, as required by law."
Notice of the sanction of a writ of certiorari and the time and place
of hearing must be given to the opposite party in interest at least
ten days before the sitting of the court to which the same is return-
able, and in default of such notice a writ of certiorari will be dis-
missed. Civ. Code Ga. 1895, § 4644. The notice in this case appears
to have been served upon the road commissioners, and, while this
fact is not expressed in the order of the superior court, it is evident
that this notice was deemed insufficient, and that the road commis-
sioners were not considered "the opposite party in interest." Upon
whom this notice should have been served is not apparent from the
statutes of the state, so far as my examination goes. Perhaps treat-
ing this proceeding as a criminal case or a quasi criminal case in the
superior court after the writ of certiorari was sanctioned, service
could have been made on the Solicitor General of the circuit. I do not
know whether this would have been held sufficient in a case of this
character or not. At all events, there was no hearing upon the merits,
in the superior court. This being true, it seems it should have no
effect here.

In Hughes v. United States, 4 Wall. 232–237, 18 L. Ed. 303, in
the opinion by Mr. Justice Field, it is said:

"It requires no argument to show that judgments like these are no bar to
the present suit. In order that a judgment may constitute a bar to another
suit, it must be rendered in a proceeding between the same parties or their
privies, and the point of controversy must be the same in both cases, and

must be determined on its merits. If the first suit was dismissed for defect of pleadings, or parties, or a misconception of the form of proceedings, or the want of jurisdiction, or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit."

Smith v. McNeal, 109 U. S. 426–430, 3 Sup. Ct. 319, 27 L. Ed. 986; St. Romes v. Levee, etc., Company, 127 U. S. 611, 8 Sup. Ct. 1335, 32 L. Ed. 289.

This case must stand, therefore, I think, on the action of the road commissioners in recommitting Pundt to jail for his failure to comply with the order of the road commissioners requiring him to work the public roads. He was in jail under this order of the road commissioners when the writ of habeas corpus was applied for.

3. The foregoing being the situation, should Pundt be discharged from custody by an order made in this proceeding?

Sections of the Revised Statutes of the United States material here are as follows:

"Sec. 751. The Supreme Court and the Circuit and District Courts shall have power to issue writs of habeas corpus.

"Sec. 752. The several justices and judges of the said courts within their respective jurisdictions, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of restraint of liberty.

"Sec. 753. The writ of habeas corpus shall in no case extend to a prisoner in jail, unless where he is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or is in custody in violation of the Constitution or of a law or treaty of the United States. * * *"

U. S. Comp. St. 1901, p. 592.

The statutes then provide the method of applying for the writ, the allowance and direction of the same, the time and character of the return, and the bringing of the body of the party before the judge for a hearing, and for a disposition of the matter.

The Supreme Court has in many cases considered and passed upon the question as to when and in what class of cases the courts shall exercise their discretion in favor of discharging a prisoner while in custody under state authority, when on the hearing of a writ of habeas corpus it is claimed that such detention of the prisoner is in violation of the Constitution or a law of the United States; and when, on the contrary, it should refuse to discharge and allow the case to go through the courts of the state, and from the highest court of the state to the Supreme Court of the United States. The Supreme Court has always held that, unless a case be exceptional, it should be allowed to take the latter course, and the courts of the United States decline to interfere by habeas corpus proceedings. The most important cases on this subject, commencing with Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868, are cited in the most recent cases, In re Lincoln, 202 U. S. 178, 26 Sup. Ct. 602, 50 L. Ed. 984, and Urquhart v. Brown, 205 U. S. 179, 27 Sup. Ct. 459, 51 L. Ed. 760. In Ex parte Royall, supra, in the opinion by Mr. Justice Harlan, he stated the rule as to how the discretion of the court should be

exercised in this class of cases. An extract from that opinion is as follows:

"We cannot suppose that Congress intended to compel those courts, by such means, to draw to themselves, in the first instance, the control of all criminal prosecutions commenced in state courts exercising authority within the same territorial limits, where the accused claims that he is held in custody in violation of the Constitution of the United States. The injunction to hear the case summarily, and thereupon 'to dispose of the party as law and justice require.' does not deprive the court of discretion as to the time and mode in which it will exert the powers conferred upon it. That discretion should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution. When the petitioner is in custody by state authority for an act done or omitted to be done in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or where, being a subject or citizen of a foreign state, and domiciled therein, he is in custody under like authority, for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption under the commission, or order, or sanction, of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations—in such and like cases of urgency involving the authority and operations of the general government, or the obligations of this country to, or its relation with. foreign nations, the courts of the United States have frequently interposed by writs of habeas corpus and discharged prisoners who were held in custody under state authority. * * *

"That these salutary principles may have full operation, and in harmony with what we suppose was the intention of Congress in the enactments in question, this court holds that where a person is in custody, under process from a state court of original jurisdiction, for an alleged offense against the laws of such state, and it is claimed that he is restrained of his liberty in violation of the Constitution of the United States, the Circuit Court has a discretion, whether it will discharge him, upon habeas corpus, in advance of his trial in the court in which he is indicted; that discretion, however, to be subordinated to any special circumstances requiring immediate action. When the state court shall have finally acted upon the case, the Circuit Court has still a discretion whether, under all the circumstances then existing, the accused, if convicted, shall be put to his writ of error from the highest court of the state, or whether it will proceed, by writ of habeas corpus, summarily to determine whether the petitioner is restrained of his liberty in violation of the Constitution of the United States."

In Urquhart v. Brown, supra, Mr. Justice Harlan, again speaking for the court on this question, said:

"The exceptional cases in which a federal court or judge may sometimes appropriately interfere by habeas corpus in advance of final action by the authorities of the state are those of great urgency that require to be promptly disposed of, such, for instance, as cases, 'involving the authority and operations of the general government, or the obligation of this country to, or its relations with, foreign nations.'"

The more important cases in which it has been held that a prisoner in state custody should be discharged when his arrest and detention is in violation of the Constitution or a law of the United States are Ohio v. Thomas, 173 U. S. 276, 19 Sup. Ct. 453, 43 L. Ed. 699, and Boske v. Comingore, 177 U. S. 459–470, 20 Sup. Ct. 701, 44 L. Ed. 846.

In Ohio v. Thomas, supra, the case was originally heard by Circuit Judge Taft in Re Thomas (C. C.) 82 Fed. 304–311. Thomas was

governor of the central branch of the National Home for Disabled Volunteer Soldiers located in Montgomery county, Ohio, the Home being established by authority of an act of Congress. A warrant was issued against Thomas, and he was arrested and brought before a justice of the peace of the state of Ohio, charging him with furnishing and serving to the inmates of the Home as food certain oleomargarine, in violation of the statutes of the state of Ohio. When brought before the justice of the peace, Thomas declined to plead to the charge, and moved to dismiss the same on the ground that the acts upon which said proceeding was founded were done by him in the discharge of his duty as governor of said Home under the authority of the board of managers in charge of said institution by virtue of the acts of Congress, and by the authority of said acts. Thomas was tried by the justice of the peace, who found him guilty and sentenced him to pay a fine of $50, or stand committed until the fine was paid. A warrant of commitment was issued against him, and he applied for a writ of habeas corpus. In the opinion, Judge Taft says:

"It is unnecessary, in my view, to consider the question, what is the territorial jurisdiction of the state of Ohio over the land occupied by the National Home at Dayton? Let it be conceded that the case presented upon the petition and the facts shown at the hearing is not different from what it would have been had the Legislature of Ohio never passed any act ceding jurisdiction to the United States over the land acquired for the purpose of a national military home. In such a case, can it be maintained that the Legislature of the state of Ohio may pass an act which shall regulate in any way the manner in which federal governmental functions shall be discharged by the board of managers of the National Home as agents of the national government? It is very clear to me that the question must be answered in the negative. Nor can there be any doubt that the acts of the petitioner complained of, and made the ground for prosecution under the state law, were acts in pursuance of the authority of the national government reposed in it by the Constitution of the United States. By that instrument Congress is given power by taxation to provide for the common defense and general welfare of the United States. It is given power to declare war, to raise and support armies, to provide and maintain a navy, to make rules for the government and regulation of the land and naval forces, to provide for calling forth the militia, to suppress insurrections and repel invasions, to provide for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, and to make all laws which shall be necessary and proper for carrying into execution these powers."

After quoting an extract from the opinion of Mr. Justice Peckham, in United States v. Gettysburg Electric Railroad Company, 160 U. S. 668, 16 Sup. Ct. 427, 40 L. Ed. 576, Judge Taft proceeds:

"The same power that exists to create national parks and to create national cemeteries is exercised in the erection and maintenance of a national home, to care for the defenders of the nation, who, though not killed, were disabled and wounded in the defense. The housing and feeding of such persons are, then, a federal governmental function and duty. When the government of the United States purchases land in a state for the purpose of discharging such a duty, it is not within the power of the State Legislature to interfere with or regulate the mode in which it shall be performed. What it does for this purpose is exactly as much within its complete control as when its quartermaster furnishes food to its soldiers, or when its pension agents distribute money to its pensioners. It is entirely immaterial in what place, within the jurisdiction of the government of the United States, the duty is discharged.

State lines cannot affect or modify the complete control which the federal government and its agents and officers duly authorized have over the manner of discharging it. The jurisdiction of the state government in such a case is excluded, not because of the place where the act is done, but because that which is being done is the business of the United States, and such business is as completely beyond the influence and control of the state government as if it were not done within the territory of the state."

This case, In re Thomas, was taken by appeal to the Circuit Court of Appeals of the Sixth Circuit, 87 Fed. 453, 31 C. C. A. 80, which disposed of the case in a per curiam as follows:

"The facts of this case are stated in the opinion of Taft, Circuit Judge, who heard the case in the court below. His opinion is reported in 82 Fed. 304. With respect to the question of law involved, we concur in the reasoning upon which Judge Taft's opinion proceeds (and which we are content to adopt as our own), and in the conclusion which he reached, save that we prefer to rest our approval of the order made by the court below upon the ground that, inasmuch as the Legislature of Ohio had no power to regulate the conduct of this administrative agency of the national government by such a statute as is here in question, it ought to be presumed that the Legislature did not intend it to have such an application, and that the statute should be construed accordingly. The order of the court below is affirmed, with costs."

In the opinion of the Supreme Court by Mr. Justice Peckham (Ohio v. Thomas, supra), it is stated:

"Whatever jurisdiction the state may have over the place or ground where the institution is located, it can have none to interfere with the provision made by Congress for furnishing food to the inmates of the Home, nor has it power to prohibit or regulate the furnishing of any article of food which is approved by the officers of the Home, by the board of managers and by Congress. Under such circumstances the police power of the state has no application.

"We mean by this statement to say that federal officers who are discharging their duties in a state, and who are engaged, as this appellee was engaged, in superintending the internal government and management of a federal institution, under the lawful direction of its board of managers and with the approval of Congress, are not subject to the jurisdiction of the state in regard to those very matters of administration which are thus approved by federal authority.

"In asserting that this officer under such circumstances is exempt from the state law, the United States are not thereby claiming jurisdiction over this particular piece of land, in opposition to the language of the act of Congress ceding back the jurisdiction the United States received from the state. The government is but claiming that its own officers, when discharging duties under federal authority, pursuant to and by virtue of valid federal laws, are not subject to arrest or other liability under the laws of the state in which their duties are performed."

And also this:

"Some of the same authorities also show that this is one of the cases where it is proper to issue a writ of habeas corpus from the federal court, instead of awaiting the slow process of a writ of error from this court to the highest court of the state where a decision could be had. One of the grounds for making such a case as this an exception to the general rule laid down in Ex parte Royall, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868, Whitten v. Tomlinson, 160 U. S. 231, 16 Sup. Ct. 297, 40 L. Ed. 406, and Baker v. Grice, 169 U. S. 284, 18 Sup. Ct. 323, 42 L. Ed. 748, consists in the fact that the federal officer proceeded against in the courts of the state may, upon conviction, be imprisoned as a means of enforcing the sentence of a fine, and thus the operations of the federal government might in the meantime be obstructed. This is such a case."

In Boske v. Comingore, supra, it appears that Comingore was collector of internal revenue of Kentucky, and in a proceeding in the

state court he declined to produce and file with the court certain books in the office of the collector. Upon his refusal to do this, he was fined and committed for contempt of court. Comingore then applied to the United States District Court for a writ of habeas corpus which was granted, and on the hearing he was discharged. This was affirmed by the Supreme Court of the United States. In the course of the opinion by Mr. Justice Harlan, he said:

"The present case was one of urgency, in that the appellee was an officer in the revenue service of the United States whose presence at his post of duty was important to the public interests, and whose detention in prison by the state authorities might have interfered with the regular and orderly course of the business of the department to which he belonged. The District Court, therefore, did not err in determining the question of the constitutional law raised by the application for a writ of habeas corpus, and rendering final judgment."

In Minnesota v. Brundage, 180 U. S. 499, 21 Sup. Ct. 455, 45 L. Ed. 639, in the opinion by Mr. Justice Harlan, the two cases just discussed are referred to in this way:

"So in Ohio v. Thomas, 173 U. S. 276, 284–285, 19 Sup. Ct. 453, 43 L. Ed. 699, which was the case of the arrest of the acting governor of the central branch of the National Home for Disabled Volunteer Soldiers at Dayton, Ohio, upon a charge of violating a law of that state, the action of the Circuit Court of the United States discharging him upon habeas corpus while in custody of the state authorities was upheld upon the ground that the state court had no jurisdiction in the premises, and because the accused, being a federal officer, 'may, upon conviction, be imprisoned as a means of enforcing the sentence of a fine, and thus the operations of the federal government might in the meantime be obstructed.' The exception to the general rule was further illustrated in Boske v. Comingore, 177 U. S. 459, 466–467, 20 Sup. Ct. 701, 44 L. Ed. 846, in which the applicant for the writ of habeas corpus was discharged by the Circuit Court of the United States while held by state officers, this court saying: 'The present case was one of urgency, in that the appellee was an officer in the revenue service of the United States whose presence at his post of duty was important to the public interests, and whose detention in prison by the state authorities might have interfered with the regular and orderly course of the business of the department to which he belonged.'"

The case at bar, in my judgment, comes within the rules laid down in these cases. If the prisoner is confined in jail in Catoosa county, it will necessarily interfere materially with the Quartermaster's Department at Ft. Oglethorpe. The importance of this department to the troops is obvious.

In view of the circumstances, I do not think the case should await the slow process and the delay of carrying it through the state courts. It is not at all clear that Pundt has any rights now in the state court. It seems that, if his right to be discharged from custody is ever to be determined, it must be determined and the petitioner have the benefit of it now.

An order will be entered discharging the petitioner, W. A. Pundt, from the custody of James B. Pendleton, jailer of Catoosa county.

There were four other cases before the court, of the same character as that of Pundt: James Price, James L. Kennedy, G. K. Peavey, and D. A. Mowery. Their cases were disposed of by the road commissioners in the same way. In one of them, however, James Price,

167 F.—64

it is admitted that no notice was given to appear and work the roads. What is said in this case is applicable in the other cases, and like orders will be made in all, as they were heard together by consent of counsel.