### UNITED STATES v. KALLAS.

(District Court, W. D. Washington, S. D. April 30, 1921.)

No. 3325.

1. **Habeas corpus ☞92(1)—Court can review evidence, to determine whether probable cause is shown.**

     On habeas corpus proceedings to procure the release of one held to answer a criminal charge, the court may review the evidence, and, if it finds that all of it, taken together, does not support the commissioner's finding of probable cause, can discharge the defendant.

2. **Criminal law ☞238—Voluntary confession is alone sufficient to warrant holding accused to answer.**

     A confession freely and voluntarily made, with full knowledge by accused that he was not required to make it, and that it might be used as evidence against him, is sufficient to show probable cause, warranting the commissioner in holding the accused to answer, under Rev. St. § 1014 (Comp. St. § 1674), without further evidence of the corpus delicti, though not sufficient to sustain a conviction, under Rem. & Bal. Code Wash. § 2309, unless made in open court.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Habeas corpus ⟷111(1)—Accused entitled to discharge, if there is no competent evidence against him.**

Though the court will not discharge on habeas corpus a prisoner held by the commissioner to answer, for mistakes by the commissioner in the admission of testimony, part of which is irrelevant or immaterial, accused will be discharged, if there is no competent evidence against him.

4. **Criminal law ⟷518(2)—Confession of accused held incompetent, as obtained by "compulsion."**

Where the confession by accused, which was the only evidence against him before the commissioner, was obtained from him while he was confined in jail through questions asked by an agent of the Department of Justice, without accused having been warned of his right to remain silent, and of the effect of his answers as evidence against him, the confession was obtained by compulsion, contrary to Const. U. S. Amend. 5, providing no person shall be compelled in a criminal case to be a witness against himself, which prohibits compulsion exercised through the process of the courts, or other laws acting directly on the party, since the process on which accused was in custody was a process of the court (quoting Words and Phrases, Compel; see, also, Words and Phrases, Compulsion).

5. **Criminal law ⟷518(2)—Prisoner in custody must be warned of right to remain silent, to make confession admissible.**

Before replies of a prisoner to questions asked him by the officers who have him in custody can be admitted as a voluntary confession, it must be shown that the prisoner was informed of his right to refuse to answer the questions, and that any answers he chose to make might be used as evidence against him.

Habeas Corpus. Petition for discharge from custody by Paul Kallas against the United States. On demurrer to the petition. Demurrer overruled.

Frank H. Kelley, of Tacoma, Wash., for petitioner.

Robert C. Saunders, U. S. Atty., of Seattle, Wash., and John M. Boyle, Jr., Asst. U. S. Atty., of Tacoma, Wash.

CUSHMAN, District Judge. The United States attorney demurs to the petition for habeas corpus. By the petition it appears that the petitioner, a young man born in Greece, came to America in 1908, coming direct to Oregon, where he worked at common labor and as a cook. He has been employed in lumber camps and on section gangs. He was a private in the late war. Petitioner has been held to answer to the grand jury by the United States commissioner. The grounds for discharge are that there is no proper cause for holding the petitioner to answer, and that the bail is excessive; that the only showing before the commissioner consisted of statements made by the accused to a government agent employed to investigate white slave charges; that accused was in the city jail at the time, in the custody of the city authorities, who held him in order to, and did, permit the government agent to have access to and question him.

The following from the examination of the government agent before the commissioner fully shows the situation in this regard:

"Q. (by the Commissioner). I will ask you, Mr. Reed, if the witness [defendant] made any statement to you as his free and voluntary act, without any duress of any kind? A. A statement was made without promise of immunity or anything on my part whatsoever, of his free will and accord.

"* * * A. No, sir. I had the defendant booked for federal investigation, That was all; no charge.

"Q. The defendant was in charge of the city authorities at the time the statement was made, under some violation of some city ordinance? A. As I understood. I don't know what the charge was.

"* * * A. My object in having him booked for federal investigation was that he might be held, so I could interview him.

"Q. Then you had requested the authorities to hold him in custody, so that you might interview him? A. Yes. * * *

"Q. You visited this defendant, without stating to him that he was being held at your request for investigation? A. I did not tell him. * * *

"Q. Did you state to the defendant, prior to any statement made by him to you, what was the purpose of your visit? A. I did not.

"Q. You did not. Did you state to him in what capacity you visited him? A. I did.

"Q. What did you state you were? A. Special agent, United States Department of Justice.

"Q. Special Agent. Did you state to him at that time that any statement made by him to you might be used against him in evidence, in case he was brought to bar for an offense against the criminal laws of the United States? * * *

"By the Commissioner: Objection sustained. I think the witness covered that question when he said this was a voluntary statement on the part of the defendant. You can develop whether he was informed of his rights later.

"By Mr. Kelley: May I suggest to the commissioner that the statement of the witness here that defendant's statement was voluntary and free is not a statement of fact, but his statement of opinion, and his statement of conclusion on his part. It is for this court ultimately to say whether the statement was made voluntarily, or whether it was made under duress, and the facts as to what occurred will determine that question. Now, the question which I put is certainly pertinent as to whether or not warning was given this defendant. If such warning was given at the time, it would tend strongly to show that the statement was not made under duress, but freely and voluntarily. If no such statement was made, the weight of the evidence then would be to support the proposition that the statement was not free and voluntary. * * *

"Q. (on cross-examination). He stated to you orally, did he, that what he had divulged to you was made voluntarily and without any promise of immunity or reward? Answer the question. I don't want you to argue the matter. That is a question that can be answered 'Yes' or 'No.' A. The statement was read to him; no, he did not.

"Q. The fact is that you reduced the statement to writing after having had this conversation with the defendant, did you not? A. I did.

"Q. And that you included in that written statement a paragraph that this defendant here told you what he had said was free and voluntary and without promise of immunity or reward? A. I did.

"Q. You put it in? A. I did.

"Q. You made the statement, not the defendant? A. I made the full statement. * * *

"Q. At the time of your examination of the defendant, did you inquire of the defendant whether he was represented by an attorney or counsel? A. I did not. * * *

"Q. Is it not a fact, sir, that the defendant told you he was represented by an attorney and stated that he desired to consult his attorney?

"By Mr. Boyle: I object. That is the same question. I enter the same objection to it.

"By the Commissioner: Objection sustained. * * *

"Q. (on redirect examination). Mr. Reed, you stated that the defendant, did you not, stated to you orally that his statement was made without any promise, and without duress; you also stated that the statement was reduced to writing. Was that statement, after it was reduced to writing—in which appeared the statement that it was made without promise or duress—

was that statement read to the defendant before he signed it? A. I read the statement to him. I said that I had written the statement previously made and asked him if he wanted to sign it."

The following is from the examination of the captain of police:

"Q. You were present, were you not, at the police station at the time the defendant was interviewed by Mr. Reed? A. Yes.

"Q. Captain, whose custody was the defendant in at that time? * * * A. In my charge at that time.

"Q. What was the charge? A. He was charged with having liquor in his possession. * * *

"Q. (on cross-examination). Captain, you have stated all that you remember of what was said or done in your presence on the occasion in question? A. I do not recall anything of any importance.

"Q. It may not appear important to you. I want you now to add to your testimony anything—any other thing—that was said or done that you recall, whether you consider it important or not. A. I don't recall that he made any other statement. He was brought in the office. The defendant was alone in the office with Reed and I. I don't remember any further conversation.

"Q. Now, I move to strike the testimony of this witness because it appears that what he has recited here the defendant said to Reed in his presence; it was incompetent, no proper foundation for the introduction of such testimony having been made. * * *

"Q. You say the defendant was taken to your office; from where? A. From the cell in the jail.

"Q. You stated that he was then under arrest on a liquor charge? A. Yes.

"Q. What other charge, if any, was pending against him? A. I don't know of any other at that particular minute, except that he was being held for investigation by the Department of Justice—federal authorities. * * *

"By the Commissioner: As I understand the motion, you are moving to strike all of the testimony that has been given upon the simple fact that the defendant was not warned of his (interrupted)—

"By Mr. Kelley: That the testimony is not admissible against him, and to discharge the defendants from custody.

"By the Commissioner: I am ready to rule on that question. * * * Afterwards the statement of the defendant was reduced to writing, and thereafter the statement was signed by the defendant. In that statement was a paragraph which stated that the defendant had not been promised any immunity or reward, etc.; but it is not clear that the defendant was informed of this fact at the time of the oral examination. * * * It is the holding of this commissioner that he is simply a committing magistrate, and he can only concern himself with the question of probable cause, and, in support of this holding, I will cite U. S. v. Bloomgart, 2 Ben. 356, 24 Fed. Cas. 1181, No. 14,612, of the District Court of the Southern District of New York, cited in U. S. v. Brauner, 7 Fed. 87. This case comes clearly within the rule stated there. That was a case of a written confession by a clerk of one of the departments of Louisville, Kentucky, who was afterwards arrested in the district of New York. He had a hearing before a commissioner, and that written confession was used against him, where he was not warned of his rights. The case is parallel to this case. The court decided that, so far as the commissioner's hearing is concerned, his written confession stated facts upon which the commissioner could find probable cause upon which to hold him. The court upheld the holding of the commissioner and issued the order of removal, returning the defendant to the district of Kentucky."

The court is unable to find anything in either of the cases cited by the commissioner to show that the defendant there was in custody when he made the confession, or that either of the confessions there involved were elicited by questions put by officers to the accused.

The word "confession," as used by the court here and herein, is used

in its common and ordinary meaning, and not in its strict legal sense.

[1] Upon habeas corpus, the court may review the evidence, to ascertain what it really shows, and, if it finds that all of the evidence, taken together, does not support the commissioner's finding of probable cause, his ruling may be disregarded and the defendant discharged. Pereles v. Weil (D. C.) 157 Fed. at page 421, and cases cited. Section 1014, R. S. (section 1674, Comp. Stats. 1916), in part provides:

"For any crime or offense against the United States, the offender may, by any justice or judge of the United States, or by any commissioner of a Circuit Court to take bail, or by any chancellor, judge of a Supreme or superior court, chief or first judge of common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where he may be found, and agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested and imprisoned, or bailed, as the case may be, for trial before such court of the United States as by law has cognizance of the offense. * * *"

A confession, alone, to warrant conviction in the state court of Washington, must be in open court. Section 2309, Rem. & Bal. Code.

[2] While the authorities are not, uniform, I am of the opinion that a confession, freely and voluntarily made, with full knowledge that the accused is not required to make it, and, if made, it may be used as evidence against him, is sufficient to constitute probable cause, and warrant the commissioner in holding the accused without further evidence of the corpus delicti. The question remains whether a confession, obtained as the one now in question was from such a defendant as the petitioner, is sufficient to constitute probable cause.

[3] In United States v. Bloomgart, Fed. Cas. No. 14,612, and United States v. Burr, Fed. Cas. No. 14,692a, there was an original signed confession introduced before the magistrate in the one case, and in the other an affidavit setting out the translation of a letter from the accused was introduced. Each was held sufficient to constitute probable cause, without other evidence of the corpus delicti. In the Burr Case, the fight made was on the evidence because of its affidavit form; that is, because it was ex parte testimony.

Testimony as to a confession upon a trial is admissible in evidence, though not sufficient to convict; but the court is now asked to go a step further, and hold that the alleged confession, obtained by an inquisition to which the accused was subjected while held in jail, at the mercy of his jailer, is admissible, without first showing that it was freely and voluntarily made, after the accused was fully advised of his rights and warned of his danger.

In U. S. v. Bell (C. C.) 81 Fed. 830, a negro, whom the court concludes to have been ignorant of his right to remain silent, was examined by a pension examiner. It is not shown that he was in custody. The court concludes, nevertheless, that he was compelled to give evidence against himself. He was not warned of his right to remain silent, nor that any statement he made to the pension examiner might be used in evidence against him. He made certain false statements under oath and was prosecuted for perjury. The case is complicated by the latter fact; but the court concludes that the protection afforded by the Fifth Amendment, even where the prosecution is for perjury in

the statement itself, instead of a mere attempt to use the statement against the accused upon the trial of the offense being investigated when the statement was made, rendered such evidence inadmissible.

In that case it was necessary for the court to go a step further in extending the protection afforded under the amendment than in the present case, for in that case the accused was committing the crime upon the examination, instead of prior thereto. It was not a case of simply being compelled to give evidence, but being compelled to act, and, in acting, commit a crime, which would not have been committed if he had not been compelled to testify. Much that is said by the court in that case is pertinent in the present suit:

" * * * Probably he never heard of this constitutional provision, and his long-established right to stand silent, and refuse to answer, when his answers might not only involve him in criminal prosecution, but submit him to the pains and penalties of yielding to the human temptation to sustain his wrongdoing by false swearing, or lose his office by removal at the hands of the state authorities, or his license as a lawyer at the hands of some court, or to be in many ways subjected to material losses and penalties by reason of his false official certificate. He was just in the situation where a man should and would, if properly advised, keep his mouth shut, and defy those who would compel him to speak concerning his conduct in the matter which had been challenged. Now, it is conceded that this examiner did not warn him of his right to be silent, as it is the duty of all officers to do when about to examine one who may be incriminated by his testimony. It may be conceded that there is no imperative obligation on the judge or other magistrate or officer who commences the examination of one who is involved by danger of criminal pursuit to warn the citizen of that danger, in the sense that, if he neglects or refuses to do so, the citizen can complain against the magistrate; and it may be conceded that it is a personal privilege to stand silent, that may be waived, and, further, that it is the duty of the citizen himself to claim his privilege whenever it is in danger. But this is all beside the question. It is the common practice and the recognized course of procedure that the judge or magistrate or other official does warn the proposed witness of his danger and his privilege to avoid it by silence, and it was not done in this case. That is one of the facts. If it further appear that the given witness was especially ignorant of his privilege, by reason of his conditions, the duty to warn is increased; and, where it has not been done, the claim of the citizen for protection against encroachment by judicial counteraction, when confronted with his oath in any way, is enlarged. * * *" 81 Fed. 838 and 839.

" * * * Truth telling may be the highest virtue, but may the Fifth Amendment be violated to enforce it? We answer 'No.' * * * To be more specific, in its application to this case, the pension examiner ought to have given the defendant warning of his danger, advised him of his right to stand absolutely silent as to any inquiry that might involve him in a criminal prosecution, and given him an opportunity, if necessary and if desired, to engage and consult counsel before he proceeded to answer the inquisition. We do not say that this is necessary in all cases, nor that there is any statutory or other obligation upon the examiner to do it in any case, but only that, in the existing state of congressional legislation upon this subject, the examination cannot be given in evidence upon a prosecution for perjury in answering the questions unless it shall appear that the citizen, having the right to stand mute, understandingly waived that right, and gave answer to the questions. No statute, rule, or regulation or act of administration in the given case can be constitutional which does not in some way protect the right to be silent if the citizen chooses to be silent. Whether any given citizen has exercised his right to *waive his privilege*, and speak voluntarily, subject to the pains and penalties of the statutes against perjury, depends upon the circumstances of each particular case, and upon those alone. In this case the defendant did

not waive his privilege under the fifth amendment, under the facts above stated." 81 Fed. 840. (Italics ours.)

" 'The maxim, "Nemo tenetur seipsum accusare," had its origin in a protest against the inquisitorial and manifestly unjust method of interrogating accused persons which has long obtained in the continental system [and Mr. Justice Brown might have added, 'suspected persons'], and until the expulsion of the Stewarts from the British throne, in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner (or suspected person), when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably those of Sir Nicholas Throckmorton and Udal, the Puritan minister, made the system so odious as to give rise to its total abolition. The change in the English criminal procedure in that particular seems to be founded upon no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular demand. But, however adopted, it has become firmly imbedded in English as well as American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused persons a part of their fundamental law; so that a maxim which in England was a mere rule of evidence became clothed in this country with the impregnability of a constitutional amendment.' Brown v. Walker, 161 U. S. 591–596, 16 Sup. Ct. 644." 81 Fed. 842.

" 'Stringent as the general rule is, however, certain classes of cases have always been treated as not falling within the reason of the rule, and therefore constituting apparent exceptions. When examined, these cases will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis for or in aid of a criminal prosecution against the witness, the rule ceases to apply, its object being to protect the witness himself, and no one else; much less that it should be made use of as a pretext for securing immunity to others.' Brown v. Walker, supra." 81 Fed. 843.

" * * * In this case, the defendant, Bell, was within the constitutional protection, and was compelled notwithstanding. In my judgment, he cannot have the protection of the Constitution, and be compelled to testify in spite of it; and his right to protection is paramount to any public policy or necessity for punishing false swearing, and, like all other desirable ends in government and all other public policies, this must yield to a constitutional guaranty which protects the citizen against invasion of his privileges. The public policy of protecting him is as much cherished by English and American sentiment as is that which insists on the purity of oaths. We must get along as best we can without breaking down the constitutional privilege, no matter what inconvenience or loss may result, or else change the Constitution. It is precisely this kind of constitutional restriction which is tolerable as against governmental supremacy. Finally, it seems quite plain that additional legislation is needed by congress to conform this system of administrative examinations in aid of the pension and other executive bureaus to the guaranty of the fifth amendment that no person shall be compelled to give evidence against himself in any criminal case, as has been done by the legislation in aid of the interstate commerce commission, as a result of the resistance in practice to the exercise of their unconstitutional demands for the testimony of witnesses who might incriminate themselves. All that we now decide to be necessary to afford the protection of the Constitution to this defendant is that unless a witness manifestly ignorant of his privilege is informed of it by the examiner, so that he may protect himself, consult counsel if he desires, and assert his right to remain silent, the examination cannot be used in evidence against him, even on an indictment for false swearing in

the progress of the examination itself. The examiner must do what the courts generally, if not always, do, in examining a witness in danger of incriminating himself, warn him of the danger, and advise him of his constitutional privilege. That was not done in this case, and the defendant must be acquitted and discharged." 81 Fed. 853, 854.

It will be noted in this case that the questioning of the accused by the pension examiner was not under process of any court, but on oral direction from the examiner and marshal to appear before the examiner.

A conviction having been had upon a confession to a policeman, uncorroborated in any way, a new trial was granted in United States v. Mayfield (C. C.) 59 Fed. 118, upon authority of 3 American & English Encyc. of Law, 447 (2d Ed. vol. 6, p. 582).

United States v. Baumert (D. C.) 179 Fed. 735, is not directly in point. There Judge Ray refused a warrant on an information, because letters do not prove themselves and the affidavit was held insufficient.

In Cohen v. U. S., 214 Fed. 23, 130 C. C. A. 417, decision by the Circuit Court of Appeals of this circuit, opinion by Judge Gilbert, in construing section 1014, R. S. (section 1674, Comp. Stat.), it was held, as shown by the fifth and seventh syllabi:

"Rev. St. § 1014 (U. S. Comp. St. 1901, p. 716), provides that any offender against the laws of the United States may be arrested, imprisoned, or bailed, etc., agreeably to the usual mode of process against offenders in a particular state. Held, that the words 'mode of process' are equivalent to 'mode of proceeding,' and hence do not include the qualifications of witnesses the competency of whom is not governed by state statute, but by the common law, except where Congress has made specific provisions on the subject. * * *

"Where a husband transported his wife in interstate commerce from one state to another for an immoral purpose, such conduct constituted a personal wrong against her which entitled her to testify against him at common law; the term 'personal injury' as applied to the wife, as used in the rule authorizing her to testify against her husband in case of a personal injury to her, not being limited to cases of personal violence, but might include cases involving a tort against the wife or a serious moral wrong inflicted on her."

In U. S. v. Greene (D. C.) 108 Fed. 816, it was decided as follows, as shown by the syllabus:

"The evidence receivable on a hearing before a commissioner in proceedings for the removal to another district of persons charged with the commission of a crime therein is not to be strictly limited by the technical rules applicable on a final trial. Where fraud is charged, or a conspiracy to defraud, a somewhat wide latitude must necessarily be given in the introduction of circumstantial evidence."

This means that a prisoner held by the commissioner would not be discharged on habeas corpus for mistakes by the commissioner in the admission of testimony, part of which is irrelevant or immaterial; but it does not authorize the holding of accused, if there is no competent evidence against him, for in the same case, cited by the United States attorney, Judge Brown says:

"2. Probable Cause. Upon a large amount of testimony taken under the order referring the matter back to the commissioner, he has committed the defendants for trial by order of March 21, 1901, in which he states that: 'After

full and fair examination touching the charge in the annexed warrant named, it appears from the testimony offered that there is probable cause to believe the defendants guilty of the charges therein contained.'

"Upon the question of the existence of probable cause to believe that an offense has been committed, the rule as respects any review of the commissioner's finding, is the same whether the question arises upon an application for removal to another district under section 1014, Rev. St., or upon habeas corpus and certiorari or an appeal therefrom in cases of international extradition. In all such cases the question upon review never is whether the proof was such as would be required to convict the accused upon a trial by jury; but only as to the existence of any legal evidence before the commissioner upon which he might find that there was reasonable cause to believe that the crime has been committed. In the case of Bryant v. U. S., 167 U. S. 104, 17 Sup. Ct. 744, 42 L. Ed. 94, the question in the opinion of Mr. Justice Brown is stated to be: 'Whether there *was any legal evidence* at all upon which the commissioner could decide that there was evidence sufficient to justify his commitment for extradition; or, as stated in Ornelas v. Ruiz, 161 U. S. 502, 508, 16 Sup. Ct. 691, 40 L. Ed. 789: "If the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offense charged is within the terms of the treaty of extradition, and the magistrate in arriving at a decision to hold the accused *has before him competent legal evidence* on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on habeas corpus.'"

"In the prior case of Oteiza v. Jacobus, 136 U. S. 330, 334, 10 Sup. Ct. 1032, 34 L. Ed. 466, the supreme court by Mr. Justice Blatchford says: 'If the commissioner has jurisdiction of the subject-matter * * * and the commissioner, in arriving at a decison to hold the accused, *has before him competent legal evidence* on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused, for the purposes of extradition, such decision of the commissioner cannot be reviewed by a circuit court or by this court, on habeas corpus, either originally or by appeal.'" 108 Fed. 819. (Italics ours.)

### In Ex parte Oxley, 38 Nev. 379, 149 Pac. 992, it was held:

"The general rule of Rev. Laws, § 7180, providing that a conviction of crime cannot be had on the uncorroborated testimony of an accomplice, is to be applied where the sole witness against the defendant on his preliminary examination is an accomplice, and a commitment on his uncorroborated testimony is not on reasonable or probable cause." Fifth syllabi.

### The court said:

"Were we inclined to doubt the wisdom of viewing the uncorroborated testimony of an accomplice with the same strictness when considering it in reference to a preliminary examination as upon a trial, we are quite sure that a comparison of the testimony given by the witness Madden upon the second preliminary examination with that given by him upon the first examination would remove any such doubt. His conflicting and utterly irreconcilable statements in reference to material matters affords a concrete illustration of the fact that the rule had its origin in necessity. Petitioners having been committed to the custody of the sheriff of Elko county on a charge of grand larceny without reasonable or probable cause, it is ordered that they be discharged forthwith from custody upon such commitment."

### In Re Dempsey (Sup.) 165 N. Y. Supp. 717, it was held:

"Pen. Code, § 286, which provides that there can be no conviction for seduction under promise of marriage on the unsupported testimony of the female seduced, does not require the formal complaint which initiates the prosecution to be supported by evidence other than that of the complaining witness, since the statute refers only to a rule of evidence in the trial and conviction of such offenders."

In People v. Cokahnour, 120 Cal. 253, 52 Pac. 505, opinion by Judge Van Fleet, the Supreme Court of California, said:

"The objection that the proceedings did not constitute an examination because no witnesses were sworn, is not well founded. Upon being informed of the charge against him, and his rights in the premises, the defendant *voluntarily made a written confession, or statement, before the magistrate,* acknowledging the commission of the offense. This was competent and sufficient evidence upon which to hold him to answer. It is not necessary to swear witnesses to prove facts which the defendant voluntarily confessed." (Italics ours.)

[4] Upon the question of what constitutes compulsion, within the meaning of constitutional provisions similar to the fifth amendment, the following synopsis is taken from Words and Phrases. vol. 2, p. 1351:

"Const. art. 1, § 6, declares that no person shall be compelled in any criminal case to be a witness against himself. Held, that the word 'compulsion,' as there used, means merely compulsion exercised through the process of the courts, or through laws acting directly on the party, and has no reference whatever to an indirect or argumentative pressure, such as is claimed is exerted by Act 1869 (Laws 1869, c. 678), declaring that on a criminal trial the accused shall at his own request, but not otherwise, be deemed a competent witness against himself. People v. Courtney, 94 N. Y. 490, 493."

In Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746, it was said:

" * * * Constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis." 116 U. S. at page 635, 6 Sup. Ct. at page 535 (29 L. Ed. 746).

In Silverthorne Lumber Co. v. United States, 251 U. S., 385, 40 Sup. Ct. 182, 64 L. Ed. 319, there had been an unlawful search by the prosecution of defendant's offices and papers seized. Copies were made by the prosecution, and the originals, on application of the defendant, ordered returned to them; but the court impounded the copies. The prosecution thereafter subpœnaed the defendant company to produce the originals, and, for the refusal to obey, the sentence of contempt was imposed. In this case the court says:

" * * * The government now, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had. The proposition could not be presented more nakedly. It is that although, of course, its seizure was an outrage which the government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession, but not any advantages that the government can gain over the object of its pursuit by doing the forbidden act. Weeks v. United States, 232 U. S. 383, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. It reduces the Fourth Amendment to a form of words. 232 U. S. 393. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evi-

dence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the government's own wrong cannot be used by it in the way proposed." 251 U. S. at pages 392 and 393, 40 Sup. Ct. at pages 182, 183 (64 L. Ed. 319).

No case has been called to the court's attention holding that evidence obtained in the manner shown here is either sufficient to show probable cause, or admissible in evidence at all. Upon the showing as now made as to the manner of obtaining the confession, the court concludes that it would not only be insufficient to warrant conviction upon the trial, but would be inadmissible upon a trial—not inadmissible because ex parte in form, or for any formal reason, but inadmissible because of the vice that is in it, on account of the manner in which it was obtained—prima facie, at least, in violation of the Fifth Amendment to the Constitution. Such a violation not only makes an outlaw of the confession upon the trial, but in any criminal legal proceeding against the accused petitioner. It is so outlawed that an indictment obtained, not upon the confession itself, but upon evidence discovered by means of the information furnished the prosecution by the confession, probably would be quashed because of such vice. Silverthorne Lbr. Co. v. U. S., supra.

[5] The accused may be presumed to know the law—that is, that any statements or admissions which he voluntarily makes will be used against him; but he will also be presumed to know that he will not be compelled to be a witness against himself and that involuntary statements cannot be used in evidence against him. Hence, the question for determination is whether, in the absence of evidence that the accused was compelled to make the statements attributed to him—that is, evidence other than that of his imprisonment or arrest—they can be considered as evidence against him. Even if he were advised that he was not compelled to answer and that statements which he made might be used in evidence against him, while constituting prima facie evidence that the statements were voluntarily made, and therefore admissible in evidence, it would not be conclusive, for the examination of a detained prisoner might be so prolonged, and of such a character, and made under such circumstances, that a court might reasonably conclude that it was not voluntary, even though he was so warned.

The questioning by or with the consent of his official captor of a prisoner is essentially inquisitorial in its nature. He is confined, and perforce must submit to such questions. True, he may remain silent; but he cannot escape the questions, as he might if he were physically free. The actual existence of duress, arising from the fact that he is confined and cannot escape his questioner, is sufficient, and requires that he be advised that he is not compelled to answer, and, if he does so, his answers will be used against him. Fairness can require no less. So much at least is guaranteed by the Fifth Amendment. How can it be said that, if a court required an accused to answer upon the witness chair, with the alternative of going to jail if he refused, was such compulsion as to invalidate the evidence so obtained, and, at the same time,

that a prisoner questioned in jail by his captor was not compelled to give evidence against himself?

Such a course would be to very nearly, if not quite, blind oneself as to what constitutes compulsion. As above pointed out, the compulsion forbidden by the amendment—or at least included in its prohibition—is compulsion exercised through the process of the court. The commitment by which the petitioner in the present case was held in jail is no less a compelling process than were he in court and ordered upon the witness chair for examination. In fact, there is greater need to safeguard the rights of the accused in this particular, when under arrest, than in the court, for in court a record is made that will, eventually, afford protection, however great the abuse practiced. It may not always be so of the prisoner subjected to an inquisition in his cell.

While it may be that many know of their rights, and, even when in prison, have the will and courage to stand upon them, there certainly are others who do not. The safer and better course to pursue is to require evidence that each and every prisoner has been advised of his right to remain silent, and warned of the danger in speaking, before any statement made is admitted, rather than enter upon a more or less speculative inquiry as to whether the statements of accused were made voluntarily or not. In the nature of things, it often happens, not only upon the examination in the jail, but upon that in court regarding the circumstances of the inquiry at the jail, that there are many against one, the accused. Whether it arises from zeal or prejudice, born of their calling, the nature of the accusation or situation, or all of these and other things, it does not matter—consciously, or unconsciously, upon such an inquisition, the police, and officers having similar duties, often array themselves against the accused. An instance of this is to be noted in the present case. While both of the witnesses for the prosecution were asked to tell all that accused said when he was examined at the jail, it remained for the leading questions of the attorney for the accused to elicit the fact that the accused was a discharged soldier of the late war, although many things had been upon direct examination recounted, no more pertinent, but which would not reflect such credit upon the accused.

The demurrer to the petition will be overruled.