LUPERCIO LÓPEZ, peticionario, *v.* CORTE DE DISTRITO DE SAN JUAN, HON. ROBERTO H. TODD, JR., JUEZ, y HERNÁN R. FRANCO, FISCAL DEL DISTRITO DE SAN JUAN, recurridos.

Núm. 77.—*Sometido:* Febrero 6, 1941. *Resuelto:* Febrero 25, 1941.

116

*R. Rivera Zayas,* abogado del peticionario; *A Cecil Snyder, Fiscal Federal,* y *Adolfo Valdés Cobián, Fiscal Federal Auxiliar,* por los Estados Unidos de América, como *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR TRAVIESO emitió la opinión del tribunal.

Ante la Corte de Distrito de San Juan se han radicado dos acusaciones separadas, bajo los números 4336 y 4337, contra el aquí peticionario Lupercio López, imputándosele en cada una de ellas la comisión de un delito distinto de violación. En un pliego de particulares sometido por el fiscal, se alega que los hechos ocurrieron en la Urbanización Eleanor Roosevelt, conocida también por Barriada Roosevelt, del término municipal de Río Piedras, que forma parte del distrito judicial de San Juan, P. R. El acusado interpuso en cada caso una excepción perentoria a la acusación, alegando que la Corte de Distrito de San Juan carece de jurisdicción para conocer y juzgar delitos cometidos dentro de los límites de dicha urbanización.

Son hechos admitidos por ambas partes, que la Urbanización Eleanor Roosevelt es una finca urbana de 227.193 cuerdas, adquirida por los Estados Unidos de América, a través de su agencia "Puerto Rico Reconstruction Administration," por compra a personas particulares; que la referida agencia del Gobierno Federal ha construído en dicha finca unas 500 casas de vivienda, de acuerdo con un proyecto aprobado por el Presidente de los Estados Unidos, para la construcción de hogares de bajo costo—"Low Cost Housing Project"—y que los fondos para la compra del terreno y la construcción de viviendas fueron puestos a disposición de dicha agencia federal (PRRA) por el Presidente, con cargo a las asignaciones hechas por el Congreso bajo la Ley de Asignaciones para Auxilio de Emergencia de 1935.

Desestimadas por la corte inferior las excepciones perentorias formuladas por el acusado, éste ha invocado la jurisdicción original de esta Corte Suprema mediante una petición en la que suplica se expida un auto inhibitorio dirigido a la Corte de Distrito de San Juan y al fiscal de la misma, ordenándoles que desistan y se abstengan de seguir nuevos procedimientos en los dos casos incoados contra el peticionario; o, en la alternativa, que se expida auto de *certiorari* para la revisión y anulación de los procedimientos seguidos ante dicha corte.

A la vista celebrada el 6 de febrero de 1941, para oír a las partes sobre la procedencia del recurso, comparecieron el letrado representante del peticionario y el Fiscal Federal Auxiliar, como *amicus curiae,* sometiendo más tarde sus respectivos alegatos.

Las contenciones del peticionario son sustancialmente las siguientes:

1ª. Que por virtud de las disposiciones de la sección 5 de la "Ley autorizando al Gobernador de Puerto Rico para traspasar ciertos terrenos a los Estados Unidos para fines navales o militares y para otros fines públicos," aprobada por la Asamblea Legislativa de Puerto Rico en febrero 16 de

1903 (secs. 1670 a 1677 E. R. de P. R., ed. 1911), El Pueblo de Puerto Rico renunció o transmitió su jurisdicción sobre los terrenos de la Urbanización Eleanor Roosevelt, a favor de los Estados Unidos, quedando dichos terrenos desde el momento en que fueron adquiridos y se tomó posesión de ellos para los fines de dicho proyecto, bajo la exclusiva jurisdicción del Gobierno Federal y de sus tribunales. El citado estatuto insular lee así:

"Sección 5.—Que se dé y por la presente se da, el consentimiento a los Estados Unidos para adquirir, para fines navales o militares u otros fines públicos, por compra o expropiación forzosa, cualesquiera terrenos en la Isla de Puerto Rico, y cuando fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de El Pueblo de Puerto Rico cesará y terminará *ipso facto*. *Disponiéndose, no obstante,* que, si subsecuentemente los Estados Unidos enajenaren cualquiera o todas las tierras adquiridas en esta forma, El Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas."

2ª. Que siendo la Urbanización Eleanor Roosevelt una obra de utilidad pública y para fines públicos, al adquirir y tomar posesión de los terrenos necesarios para dicha urbanización, los Estados Unidos aceptaron la autorización y consentimiento prestados por El Pueblo de Puerto Rico en virtud de la citada ley insular, adquiriendo al mismo tiempo jurisdicción exclusiva sobre dichos terrenos; y que desde ese momento El Pueblo de Puerto Rico y sus tribunales carecen en absoluto de jurisdicción para perseguir o castigar por delitos públicos cometidos dentro de los límites de la urbanización.

Las dos cuestiones a resolver pueden formularse así:

1ª. ¿Han adquirido los Estados Unidos, por virtud de las disposiciones de la sección 5, supra, y de la compra y toma de posesión, y sin necesidad de algún otro acto o formalidad, jurisdicción exclusiva sobre los terrenos de la Urbanización Eleanor Roosevelt?

2ª. ¿Es válida y efectiva la renuncia o cesión de jurisdicción sobre terrenos que forman parte del territorio insular, usados para los fines de un "Low Cost Housing Project," sin que en el mismo instante o con posterioridad a tal renuncia o cesión el Gobierno de los Estados Unidos acepte y asuma la jurisdicción exclusiva sobre los mismos?

Ambas preguntas requieren una contestación negativa.

La Constitución de los Estados Unidos dispone (Artículo I, sección 8, cláusula 17) que el Congreso ejercerá el poder legislativo y autoridad exclusiva sobre todos aquellos locales (*places*) comprados con el consentimiento de la Legislatura del Estado en que radicaren, para la construcción de fuertes, almacenes, arsenales, muelles, y otros edificios necesarios.

El propósito de la Asamblea Legislativa insular al aprobar la sección 5 de la ley de 1903, supra, fué otorgar de una vez su consentimiento para todos aquellos casos en que los Estados Unidos adquieran por compra o expropiación, "para fines navales o militares u otros fines públicos," cualesquiera terrenos en la Isla de Puerto Rico. El lenguaje del estatuto local no siguió estrictamente el de la cláusula constitucional, pero dice sustancialmente lo mismo, pues es obvio que los fuertes, los almacenes, los arsenales y los muelles se construyen "para fines navales o militares." La frase de la cláusula constitucional "y otros edificios necesarios," es menos amplia que la del estatuto insular "u otros fines públicos." A los fines de determinar cuándo y cómo se transfiere al Gobierno Federal, automáticamente, la jurisdicción exclusiva sobre los terrenos que adquiere por compra con el consentimiento de un Estado, hemos hecho un detenido estudio de la jurisprudencia interpretativa de la disposición constitucional sobre la materia.

Cuando el Gobierno Nacional compra terrenos para dedicarlos a uno de los propósitos específicamente mencionados en la Constitución, y la legislatura del Estado ha dado su consentimiento para dicha adquisición, los terrenos así com-

prados quedan *ipso facto* sometidos al exclusivo poder legislativo del Congreso; y desde ese momento cesa por completo y como consecuencia inevitable la jurisdicción estatal, porque la jurisdicción exclusiva va siempre acoplada al poder legislativo exclusivo. *U. S.* v. *Cornell* (C.C. R.I. 1819) 2 Mason, 60, 25 Fed. Cases Núm. 14,867; *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525, 29 L. Ed. 264. En el último caso citado, al sostener que el Estado de Kansas no había perdido su jurisdicción sobre la Reserva Militar de Fort Leavenworth, la Corte Suprema Federal sentó la regla aplicable cuando los terrenos han sido comprados por el Gobierno Federal ''para la construcción de fuertes, almacenes, arsenales, muelles, y otros edificios necesarios,'' sin el consentimiento del Estado, expresándose así:

''El consentimiento de los estados para la compra de terrenos dentro de sus límites para los propósitos especiales mencionados es esencial, de acuerdo con la Constitución, para transferir al Gobierno Federal, junto con el título, la jurisdicción política y el dominio. Cuando las tierras son adquiridas sin tal consentimiento, la posesión de los Estados Unidos, a menos que la jurisdicción política le haya sido cedida en alguna otra forma, es simplemente la de un propietario ordinario. La propiedad en ese caso, a menos que sea usada para llevar a cabo los propósitos del gobierno, está sujeta a la autoridad legislativa y al control de los estados al igual que la propiedad de ciudadanos privados.

.    .    .    .    .    .    .    .

''Por consiguiente, cuando los Estados Unidos han adquirido terrenos dentro de los límites de un estado, en cualquier otra forma que no sea por compra con el consentimiento del estado, el Gobierno Federal poseerá los terrenos sujetos a la siguiente condición: que si sobre ellos se construyen fuertes, arsenales u otros edificios públicos para los usos generales del Gobierno Federal, tales edificios, con sus pertenencias, como instrumentos para el ejercicio de sus poderes, estarán libres de aquella intervención y jurisdicción del estado que pudiera destruir o disminuir su uso efectivo para los fines indicados. Tal es la ley con referencia a todas las instrumentalidades creadas por el Gobierno General. Su exención del control del estado es esencial a la independencia y autoridad soberana de los Estados Unidos dentro de la esfera de sus poderes delegados. Pero cuando no son usados

como tales instrumentalidades, el poder legislativo del Estado sobre los locales adquiridos será tan completo como sobre cualquiera otra propiedad dentro de sus límites.''

¿Pertenecen las viviendas construídas por la PRRA en la .Urbanización Eleanor Roosevelt a la clase de edificaciones a que se refiere la frase '' y otros edificios necesarios'' (*and other needful buildings*) del Artículo 1, sección 8, cláusula 17 de la Constitución Federal? Opinamos que no. De acuerdo con los párrafos que hemos transcrito del caso de Fort Leavenworth, supra, los ''other needful buildings'' a que se refiere la Constitución son aquellos que se usan para llevar a cabo los propósitos del gobierno y que éste necesita utilizar como instrumentos para el ejercicio de sus poderes gubernamentales. Véanse: *U. S.* v. *Tucker,* 122 Fed. 518; *Pundt* v. *Pendelton,* 167 Fed. 997; *U. S.* v. *Wurtzbarger,* 272 Fed. 752; *People* v. *Mouse,* 203 Cal. 782; *State* v. *Mack,* 47 Pac. 763. Cuando los edificios son de esa naturaleza, la jurisdicción estatal no puede intervenir en forma tal ''que pudiera destruir o disminuir su uso efectivo'' para los fines gubernamentales, aun cuando el terreno en que radican haya sido comprado sin el consentimiento del estado. Se ha resuelto en *Battle* v. *United States,* 209 U. S. 36, 52 L. Ed. 670, que el Congreso tiene poder para comprar terrenos para la construcción de correos o cortes, y que cuando la compra se hace con el consentimiento del estado, el Congreso adquiere el poder exclusivo de legislar sobre esos terrenos, por figurar los edificios de correos entre los ''otros edificios necesarios'' (*other needful buildings*) a que se refiere el citado precepto constitucional. Véanse: *Chicago, R. I. & P. Ry. Co.* v. *McGlinn,* 114 U. S. 542, 29 L. Ed. 270; *Benson* v. *U. S.,* 146 U. S. 325, 36 L. Ed. 991.

Alega el peticionario que el proyecto de Urbanización Eleanor Roosevelt es una obra de utilidad y para fines públicos, que tiende a promover la salud, el *comfort* y el bienestar de los ciudadanos, proveyéndoles de viviendas higiénicas y baratas; y que al adquirir los terrenos, tomar posesión de

ellos y proceder a la construcción de la barriada, el Gobierno Federal aceptó la autorización y consentimiento otorgados por El Pueblo de Puerto Rico en virtud de la ley de 1903.

En *Re O'Connor,* 37 Wis. 386, se trataba de la compra de tierras por una corporación organizada por una ley del Congreso, para establecer en ellas el "Asilo Nacional para los Soldados Voluntarios Inválidos." Se resolvió que la cesión que se había intentado hacer no confería jurisdicción exclusiva al Gobierno Nacional "porque la Legislatura no tiene facultad para abdicar su jurisdicción sobre su territorio, excepto cuando las tierras son compradas por los Estados Unidos para los fines a que se refiere la Constitución." Y al contestar el argumento de que los servicios que prestaba la corporación eran de carácter público, la corte se expresó así:

"La corporación es por su naturaleza y objeto una institución caritativa pública, digna, sin duda alguna, del favor público y de la munificencia privada. No debe ser, sin embargo, confundida con el Gobierno General; ni sus derechos y propiedades son en ningún sentido justo y legal derechos y propiedades de los Estados Unidos."

En *Re Kelly,* 71 Fed. 545, 552, la Corte de Circuito de Wisconsin resolvió:

"Un estatuto del estado, que provee 'que la jurisdicción sobre las varias parcelas más adelante mencionadas sea y por la presente es cedida a los Estados Unidos de América,' no concedió jurisdicción exclusiva cuando el propósito era uno no específicamente mencionado en la Constitución, y uno que no requería y sobre el cual el Congreso no tuvo intención de ejercer jurisdicción exclusiva. Tal estatuto debe ser interpretado en el sentido de ceder—o sea, traspasar o renunciar—a favor de los Estados Unidos toda la jurisdicción que el Congreso pueda encontrar que es necesaria para los objetos de la cesión y para el ejercicio de la cual debe adoptar leyes claras conducentes a ese fin y dentro de sus facultades."

Durante la argumentación ante esta corte, y en sus alegatos, las partes han admitido—y de ello podemos tomar conocimiento judicial—que tanto el Gobierno Insular como el Municipal de Río Piedras ejercen funciones y facultades

gubernamentales dentro de los límites de la Urbanización Eleanor Roosevelt, para el servicio, beneficio y protección de los ciudadanos allí residentes. Los niños de la barriada asisten a escuelas públicas mantenidas por el Gobierno Insular. Éste mantiene allí, también a su costo, dispensarios y clínicas médicas y odontológicas para atender a la salud de los vecinos no pudientes. El orden público es mantenido allí por miembros del cuerpo de la Policía Insular. Los servicios de agua, extracción de basura y extinción de incendio son suministrados por los gobiernos municipales de San Juan y Río Piedras. La barriada está físicamente incorporada a la municipalidad de Río Piedras, sin que existan cercas ni monumentos de clase alguna que sirvan para demarcar sus linderos, y sus calles están abiertas al libre tráfico de cuantos deseen circular por ellas. Todos estos hechos constituyen, a nuestro juicio, prueba fehaciente de que el proyecto, por su naturaleza, no puede ser considerado como uno de los específicamente mencionados en la Constitución; que dicho proyecto no requiere para su debido desarrollo y funcionamiento el ejercicio de jurisdicción exclusiva por el Congreso; y por último, que el Congreso no ha revelado en manera alguna su intención de aceptar y asumir jurisdicción exclusiva sobre dicha urbanización. En el caso de *Rainier National Park Co.* v. *Martin,* 23 Fed. Supp. 60 (véase 18 Fed. Supp. 481), decidido en 1938, y en el cual la Corte Suprema denegó el *certiorari* (302 U. S. 661), se resolvió que cuando los Estados Unidos compran tierras con el consentimiento de la Legislatura del estado para un propósito que no sea de los enumerados en la Constitución, "dichas tierras y los edificios que en ellas se construyan para uso del Gobierno Federal estarán libres de cualquier interferencia y jurisdicción del estado que pueda menoscabar su uso efectivo para los fines para los cuales fué adquirida la propiedad." Y en *Williams* v. *Arlington Hotel Co.,* 22 Fed. (2d) 669, se resolvió que la jurisdicción de los Estados Unidos es exclusiva cuando el estado cede el terreno para propósitos gubernamentales; pero, si se ad-

quiere para cualquier otro propósito, la posesión de los Estados Unidos es meramente la de un propietario.

La Corte Suprema Federal en una de sus recientes decisiones, *Ryan* v. *State of Washington,* (1938), 302 U. S. 186, 82 L. Ed. 187, sentó la regla que consideramos aplicable a la situación que presenta el caso ante nos. La cuestión que resolvió la Corte Suprema fué la de si los terrenos adquiridos por el Gobierno Federal para el Proyecto de Construcción del ''Grand Coulee Dam,'' con el consentimiento del Estado de Washington, otorgado a virtud de un estatuto sustancialmente igual al de Puerto Rico, estaban bajo la exclusiva jurisdicción de los Estados Unidos. Las condiciones y circunstancias bajo las cuales se organizó la vida de la comunidad de trabajadores empleados en la construcción de la represa, eran idénticas a las que prevalecen en la Urbanización Eleanor Roosevelt. El estado cooperaba con el Gobierno Federal para que los trabajadores y sus familiares tuviesen todas las facilidades y servicios requeridos por la vida en comunidad. La Corte Suprema teniendo en cuenta esos hechos, dijo:

''No se presenta cuestión alguna en cuanto a la autoridad constitucional del Congreso para realizar esta empresa o para adquirir los terrenos necesarios o adecuados para ese propósito. No hay contención alguna de que el estado pueda intervenir en el desarrollo del proyecto. La cuestión sobre la jurisdicción territorial exclusiva es distinta. Esa cuestión asume la ausencia de toda clase de interferencia con el ejercicio de las funciones del Gobierno Federal y es si los Estados Unidos han adquirido autoridad legislativa exclusiva hasta el punto de privar al estado del ejercicio de toda autoridad legislativa incluyendo la facultad de imponer contribuciones y la de mantener el orden público en relación con las propiedades y actividades de los individuos y corporaciones dentro del territorio. La adquisición de título por los Estados Unidos no es suficiente para efectuar esa exclusión. Debe aparecer que el estado, por consentimiento o cesión, ha transferido a los Estados Unidos ese residuo de jurisdicción que de otro modo podría ejercer libremente. (Citas.)

''.

"No solamente encontramos que no se ha violado el derecho federal o frustrado la intención federal por la interpretación que el estado ha dado al estatuto, sino que la evidencia es clara de que el Gobierno Federal tuvo el propósito de que continuase existiendo la jurisdicción estatal consistente con las funciones federales e invitó la cooperación del estado al proveer un apropiado ejercicio de autoridad local sobre el territorio.

"Aun cuando asumiéramos que el estatuto del estado debería ser interpretado en el sentido de ser aplicable a las adquisiciones federales aquí envueltas, todavía nos enfrentaríamos con la contención del Gobierno de que éste no estaba obligado a aceptar, y no ha aceptado, un traspaso de jurisdicción exclusiva. Como ese traspaso está basado en una concesión del estado, mediante consentimiento o cesión, resulta, de acuerdo con principios familiares aplicables a las concesiones, que la concesión puede ser aceptada o rechazada. La aceptación puede presumirse en ausencia de evidencia de una intención en contrario, pero no conocemos ningún principio constitucional que obligue a los Estados Unidos a aceptar una jurisdicción exclusiva en contra de su propia concepción de sus intereses. El mero hecho de que el Gobierno necesite el título sobre propiedades dentro de los límites de un estado, las cuales pueden ser adquiridas sin necesidad del consentimiento del estado (citas), no hace necesario que el Gobierno asuma las cargas incidentales a una jurisdicción exclusiva. Hemos dicho con frecuencia que nuestro sistema de gobierno es un ajuste práctico mediante el cual la autoridad nacional puede ser mantenida en todo su alcance, sin pérdida innecesaria de la eficiencia local. Al adquirir propiedades, la función federal proyectada puede cumplirse sin perturbar la administración local en aquellos asuntos que pueden quedar apropiadamente bajo la autoridad del estado. En nuestra opinión en *James* v. *Dravo Contracting Co.*, 302 U. S. 134, ante, observamos que la posible importancia de reservar al estado jurisdicción para los propósitos locales, que no implique una interferencia en el cumplimiento de funciones gubernamentales, se hace más y más clara a medida que las actividades del Gobierno se expanden y se adquieren grandes extensiones de terreno dentro de los estados. Y añadimos que parecía no existir razón alguna por la cual los Estados Unidos debieran ser obligados a aceptar jurisdicción exclusiva o el estado obligado a concederla al dar su consentimiento para las compras."

Desde el año 1841 hasta 1930 estuvo en vigor un estatuto federal que en lo que es pertinente disponía:

"No se invertirán fondos públicos en ningún solar o terreno comprado por los Estados Unidos con el propósito de construir sobre el mismo cualquier aduana, u otro edificio público, de cualquier clase que sea, hasta que se haya obtenido la opinión del Attorney General en favor de la validez del título y mientras el consentimiento de la Legislatura del Estado en que radique el solar o terreno, para la compra, haya sido otorgado..." (40 U.S.C.A., sec. 255, pág. 71.)

Nada dice el citado estatuto sobre jurisdicción. Bastaba el consentimiento del estado para que se hiciese la compra por el Gobierno Federal y que el edificio fuese uno de los comprendidos dentro del precepto constitucional para que los Estados Unidos adquiriesen jurisdicción exclusiva.

En el año 1930, cuando el Gobierno Nacional comenzó a desarrollar su política de ayudar a los Estados y Territorios en la eliminación de arrabales, construcción de viviendas de bajo costo y otros proyectos de emergencia, y más tarde, en febrero 1, 1940, el Congreso, deseando evitar que la adquisición de terrenos con el consentimiento de los estados impusiera al Gobierno Federal la obligación de aceptar y ejercer jurisdicción exclusiva sobre dichos proyectos, enmendó la sección 255, supra, para que leyera, en lo que es pertinente, así:

"No obstante cualquiera otra disposición legal, la obtención de jurisdicción exclusiva para los Estados Unidos sobre tierras o intereses sobre las mismas que hayan sido o puedan ser en lo futuro adquiridos por ellos, no será requerida; pero el jefe u otro funcionario autorizado de cualquier departamento o establecimiento independiente o agencia del Gobierno puede, en los casos y en las fechas que considere deseables, aceptar o conseguir del estado en el que radiquen cualesquiera tierras o intereses sobre las mismas que estén bajo su inmediata jurisdicción, cuidado o control, el consentimiento para o la cesión de tal jurisdicción, exclusiva o parcial, si no se hubiere obtenido previamente, sobre cualquiera de dichas tierras o intereses según lo estime conveniente, *y hacer constar la aceptación de tal jurisdicción en nombre de los Estados Unidos archivando a*

*ese efecto un aviso de tal aceptación con el Gobernador de dicho Estado o en cualquiera otra forma que prescribieren los estatutos del estado en que estén situadas dichas tierras.* A menos y hasta que los Estados Unidos hayan aceptado jurisdicción sobre las tierras que se adquieran en lo futuro, se presumirá concluyentemente que tal jurisdicción no ha sido aceptada. (Bastardillas nuestras.) 40 U.S.C.A. 255, Supplement, 1940-41.

Por lo tanto, mientras no se presente prueba de que los Estados Unidos han aceptado y asumido jurisdicción exclusiva sobre la urbanización, debemos presumir concluyentemente que la jurisdicción no ha sido aceptada.

En junio 29, 1936, el Congreso, con el propósito evidente de evitar el tener que asumir y ejercer jurisdicción exclusiva sobre los proyectos para eliminación de arrabales y de viviendas a bajo costo (*low-cost housing*), adoptó el siguiente estatuto:

"Sec. 421. *Jurisdicción del estado o subdivisión política; derechos civiles bajo la ley local reservados.*

"La adquisición por los Estados Unidos de cualquier propiedad inmueble adquirida antes o después de junio 29, 1936, en relación con cualquier proyecto de viviendas a bajo costo o de eliminación de arrabales, construído antes o después de junio 29, 1936, con fondos asignados a la 'Federal Emergency Administration of Public Works' de acuerdo con las secciones 401 a 411 de este título, la Emergency Relief Appropriation Act of 1935, o cualquiera otra ley, no será interpretada en el sentido de privar a ningún estado o subdivisión política del mismo de su jurisdicción civil o criminal en y sobre dicha propiedad, o de menoscabar los derechos civiles bajo la ley local de los inquilinos o habitantes de dicha propiedad; y en cuanto y hasta donde esa jurisdicción haya sido quitada a cualquier Estado o subdivisión, o tales derechos hayan sido menoscabados, la jurisdicción sobre cualquier propiedad de esa clase queda por el presente cedida de nuevo a tal Estado o subdivisión. (Junio 29, 1936, c. 860, sec. 1, 49 Stat. 2026.)" 40 U.S.C.A., sec. 421, 1938 Supp.

De acuerdo con los hechos admitidos y la jurisprudencia y estatutos a que nos hemos referido, opinamos y resolvemos que los Estados Unidos al comprar y tomar posesión de los terrenos de la Urbanización Eleanor Roosevelt, no asumieron

*ipso facto* jurisdicción exclusiva sobre dicha urbanización, por no pertenecer las edificaciones en ella construídas a la clase de "otros edificios necesarios" a que se refiere la Constitución; que no habiéndose alegado ni presentado evidencia alguna de la aceptación de jurisdicción exclusiva por el Gobierno Federal, estamos obligados a presumir concluyentemente que no ha habido tal aceptación; y por último, que si El Pueblo de Puerto Rico en algún momento o por cualquier causa dejó de tener jurisdicción civil y criminal sobre los terrenos y sobre los habitantes de dicha urbanización, esa jurisdicción fué readquirida por virtud de las disposiciones de la sección 421, supra, con la sola y única limitación de que El Pueblo de Puerto Rico no puede intervenir en forma alguna en la administración de la barriada, ni realizar acto alguno que pueda destruir o disminuir el uso efectivo de las propiedades para los fines a que han sido dedicadas.

La cesión o renuncia de jurisdicción hecha por la Asamblea Legislativa de Puerto Rico a virtud de la ley de 1903 no es ni puede ser efectiva hasta que el Gobierno Federal la haya aceptado. Mientras no exista esa aceptación, el Gobierno Insular puede y debe continuar ejerciendo jurisdicción civil y criminal en y sobre la Urbanización Eleanor Roosevelt y sus habitantes, pues no podemos concebir que el Congreso y la Legislatura Insular hayan tenido la intención de crear a la sombra de la bandera nacional una zona de anarquía, en donde pueda cometerse el más grave de los delitos, con absoluta impunidad, por no existir tribunal federal o insular con jurisdicción para castigarlo.

Por las razones expuestas, opinamos que la Corte de Distrito de San Juan tiene amplia jurisdicción para conocer de y castigar por los delitos que puedan cometerse dentro de los límites de la Urbanización Eleanor Roosevelt y que *no ha lugar a la expedición de ninguno de los autos solicitados.*

*La petición debe ser desestimada.*

El Juez Asociado Sr. Todd, Jr., no intervino.